322 F.2d 656
 INDEPENDENT IRON WORKS, INC., a corporation, Appellant,
v.
UNITED STATES STEEL CORPORATION, Bethlehem Pacific Coast Steel Corporation, Bethlehem Steel Company, and Kaiser Steel Corporation, Appellees.
 No. 16731.
 United States Court of Appeals Ninth Circuit.
 July 16, 1963.
 
 COPYRIGHT MATERIAL OMITTED Clifton Hildebrand, Hildebrand, Bills & McLeod, Oakland, Cal., Julian Caplan, Caplan, Berlin, O'Grady & Doll, San Francisco, Cal., for appellant.
 Morris M. Doyle, John N. Hauser, Frederic A. Sawyer, McCutchen, Doyle, Brown & Enerson, San Francisco, Cal., for appellee U. S. Steel Corp.
 Francis N. Marshall, James Michael, George A. Sears, Pillsbury, Madison & Sutro, San Francisco, Cal., for appellees Bethlehem Pacific Coast Steel Corp., and Bethlehem Steel Co.
 Gordon Johnson, Max Thelen, Jr., Thelen, Marrin, Johnson & Bridges, San Francisco, Cal., for appellee Kaiser Steel Corp.
 Before HAMLEY, HAMLIN and KOELSCH, Circuit Judges.
 KOELSCH, Circuit Judge.
 
 
 1
 In this private antitrust suit for treble damages the District Court, concluding that there was no substantial evidence tending to establish liability on the part of the defendants, directed the jury to render verdicts against plaintiff and thereafter dismissed the action. Plaintiff has appealed.[1] The opinion of the District Court appears in 177 F.Supp. at 743.
 
 
 2
 The plaintiff, Independent Iron Works, Inc., has been engaged in the business of steel fabricating and construction since 1924 and maintains a plant in Oakland, California. Its operations include the erecting of steel framework for buildings, bridges, and other structures, and the making of underframes for railroad freight cars. Plaintiff produces no steel but buys all its material; and it is reasonable to conclude that the producers' refusal to sell plaintiff structural steel in unlimited amount during the last half of 1955 precipitated this litigation.
 
 
 3
 Plaintiff's complaint named ten defendants.[2] Prior to trial six were dismissed because of lack of service, or for other reasons not necessary to notice; those remaining are United States Steel Corporation (U. S. Steel), Bethlehem Steel Company (Bethlehem), Bethlehem Pacific Coast Steel Corporation (Bethlehem Pacific) and Kaiser Steel Corporation (Kaiser). Bethlehem and Bethlehem Pacific were separate companies until their merger shortly before trial. They both had been subsidiaries of Bethlehem Steel Corporation, a holding company.
 
 
 4
 Although these defendants are primarily producers of steel, all of them save Bethlehem, whose business is carried on entirely outside of plaintiff's trade area, have maintained divisions which operate fabricating plants in competition with plaintiff. As producer-fabricators these defendants are, in the parlance of the economist, "vertically integrated," that is, they combine under one main organization distinct business operations at more than one level. See generally Kessler & Stern, Competition, Contract, and Vertical Integration, 69 Yale Law Journal 1 (1959).
 
 
 5
 Plaintiff's Second Amended Complaint, on which this case went to trial, is in three counts. By two of the counts plaintiff charged all of the defendants collectively with a conspiracy to restrain and monopolize trade "on the Pacific Coast" in the distribution, fabrication and erection of structural steel; plaintiff further charged Bethlehem and Bethlehem Pacific with a separate conspiracy to the same end; and plaintiff charged each defendant individually with monopolizing and attempting to monopolize trade in said businesses in violation of Sections 1 and 2 of the Sherman Act. 50 Stat. 693 (1937) and 26 Stat. 209 (1890), as amended, 15 U.S.C. §§ 1, 2 (1958). The third count charged U.S. Steel alone with preventing plaintiff from bidding and freely competing for business of the Southern Pacific Company, purportedly in violation of Section 10 of the Clayton Act.[3]
 
 
 6
 The pretrial order identified as the trade area, referred to in the complaint, seven of the Western United States — Arizona, California, Idaho, Nevada, Oregon, Utah and Washington. It particularized the acts relied upon by plaintiff to establish its several claims and limited plaintiff's substantive claims to those allegedly arising during the period from January 21 through November 28, 1955.
 
 
 7
 The types of material used by structural fabricators consist principally of plates and shapes. Plates are simply flat pieces of steel, while shapes are forms such as I-beams, channels and Z bars. I-beams and channels are commonly used as the framework for buildings and bridges. I-beams, having a web of 24 inches or over between base and top, are known in the trade as wide flange beams, while those of smaller dimensions and ordinary girders are generally referred to as standard structurals. These various materials, although produced in a broad range of sizes, are standardized so that any shape or plate made by one producer is identical to that made by any other. Z bars are long strips of steel formed longitudinally so as to resemble the letter "Z" from side view; they are used as the principal member of the frame in railway freight cars. These types of steel are produced by passing ingots through machines which roll them.
 
 
 8
 Each type of material, and each size of each type, requires a separate machine for rolling. Such machinery represents a large capital outlay and every mill is not equipped to turn out a full line of material. Thus it appears that Kaiser and Bethlehem Pacific could roll only plate up to that of medium dimension and the more frequently used standard structurals, but not wide flange beams, Z bars and heavy plate; Bethlehem could produce both types of steel in a full range of sizes, but its mills were all located in the eastern part of the United States and it did not accept orders from fabricators on the West Coast. Instead it required them to order through Bethlehem Pacific. In this manner and only to the extent that steel was available from Bethlehem, Bethlehem Pacific could offer a full line of steel to its customers. United States Steel produced both types and all sizes of material, but none of its mills in the western United States was equipped to roll wide flange beams or heavy plate. These products were made in the Midwest and, like those of Bethlehem, had to be shipped in. However, the over-all cost to a buyer of U.S. Steel's wide flange and heavy plate laid down on the West Coast ranged from eight to nine dollars a ton higher than that of Bethlehem's comparable products because United States Steel was obliged to ship by rail whereas Bethlehem, due to the location of its mills, was able to use less expensive ocean freight. As a result, U. S. Steel ordinarily sold only a small tonnage of wide flange and heavy plate on the West Coast and Bethlehem Pacific was the principal source for that material.[4]
 
 
 9
 On appeal, plaintiff freely concedes that there was no direct proof to support its charges against the defendants and that liability must be rested upon circumstantial evidence. It contends that all or some of the conspiracies charged may be fairly inferred from the proof which (in its opinion) shows that the business behavior of the defendants was marked by unanimity.
 
 
 10
 After a painstaking review of the voluminous record, consisting of over 4,000 pages of testimony and several hundred exhibits, we are fully satisfied and firmly convinced that plaintiff's entire case comes within the rule approved by the Supreme Court, that "it is the duty of the judge to direct a verdict in favor of one of the parties when the testimony and all the inferences which the jury could justifiably draw therefrom would be insufficient to support a different finding." Baltimore & O. R. R. v. Groeger, 266 U.S. 521, 524, 45 S.Ct. 169, 171, 69 L.Ed. 419 (1925). Accord, Gunning v. Cooley, 281 U.S. 90, 50 S.Ct. 231, 74 L.Ed. 720 (1930); Southern Pac. Co. v. Pool, 160 U.S. 438, 16 S.Ct. 338, 40 L.Ed. 485 (1896).
 
 
 11
 Parenthetically we deem it appropriate at this point to observe that, although we have set out and discussed seriatim the various business practices which plaintiff contends the defendants commonly followed, nevertheless we have, in fact, considered them collectively and our conclusion reflects a faithful adherence to the recent admonition of the Supreme Court that "in cases such as this, plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each." Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 699, 82 S.Ct. 1404, 1410, 8 L.Ed. 2d 777 (1962).
 
 
 12
 The record shows that until mid-1955 plaintiff had been able to purchase structural steel from the defendants without difficulty and in whatever amounts it desired. Thereafter, however, the defendants all commenced to reject or severely limit plaintiff's orders and often made delivery much more slowly than before, and their behavior prevented plaintiff from seizing many job opportunities and also caused plaintiff to default on a number of contracts that it had undertaken.
 
 
 13
 The mere fact that two or more of the defendants dealt with plaintiff in a substantially similar manner does not support an inference of conspiracy, even though each knew that the business behavior of another or the others was similar to its own. Theatre Enterprises, Inc. v. Paramount Film Distrib. Corp., 346 U.S. 537, 540-541, 74 S. Ct. 257, 98 L.Ed. 273 (1954). Like businesses are generally conducted alike and, as the trial judge correctly stated, similarity in operations lacks probative significance unless present "under circumstances which logically suggest joint agreement, as distinguished from individual action." See Fox West Coast Theatres Corp. v. Paradise Theatre Bldg. Corp., 264 F.2d 602 (9th Cir. 1958).
 
 
 14
 The inference of conspiracy, based upon the defendants' approximately simultaneous change in their manner of dealing with plaintiff, might have been permissible in the absence of evidence showing that their respective actions were prompted by some fact other than mutual understanding or agreement. However, here it appears beyond question that outside factors dictated the change. In early 1955 the market for structural steel construction was such that the defendants were well able to supply, and they did supply in full, the needs of all their customers, including the plaintiff, but in mid-year an unexpected building boom suddenly occurred, causing a radical shift in the demand for structural steel. Almost overnight the defendants were deluged with unsolicited orders for steel far in excess of their production capacity; and the demands upon them continued to mount in the weeks that followed. To make matters more difficult, the defendants had no way of determining how long the unusual demand would continue or where it would eventually level off. While this new market pattern was emerging, the defendants began to concern themselves with the problem of distribution of structural steel. Eventually, during the summer of 1955, all of them imposed artificial controls which effectively rationed their production among fabricators generally. In this milieu we see no justification for an inference of any Sherman Act violation from the fact that all the defendants changed their mode of distribution at about the same time.
 
 
 15
 It is undisputed that over the years the number of independent fabricators has steadily increased; that each year they have gained a larger share of the market, and that their orders account for the bulk of the steel produced. Clearly each defendant was fully justified, if not actually impelled, to take some affirmative steps in its own behalf to preserve so far as possible the continued good will of customers. Moreover, there was very little similarity of detail in the way each defendant divided production. In the beginning, Bethlehem placed no restrictions on Bethlehem Pacific's purchases of heavy plate or eastern structural and simply cautioned the latter to carefully screen customers' orders and accept only those that appeared urgent. Later Bethlehem did take positive steps to curb orders, limiting the tonnage available to Bethlehem Pacific to an amount equal to that purchased in 1954 when no shortage existed. Bethlehem Pacific, on the other hand, at no time limited orders for its own products but did set up quotas for those of Bethlehem. These quotas were based upon the past purchase records of each particular customer during 1953 and 1954.[5] United States Steel, at the very outset of the shortage set up a definite quota, termed "entry limit," for each customer and used a different base period from that of either Bethlehem Pacific or Bethlehem to determine quotas.[6] Additionally U. S. Steel, unlike Bethlehem Pacific, which placed a separate quota on each type of steel, simply restricted total tonnage and allowed customers to apply their quotas as they chose.[7] Kaiser had no over-all policy covering distribution and accepted orders on the understanding that delivery would be made at the earliest date consistent with prior bookings and the relative urgency of all customers' needs. These methods do not evidence similarity; their variety strongly suggests individual action.
 
 
 16
 There is evidence to the effect that by 1955, when Kaiser purchased the facilities of Union Steel Company at Montebello, California, all of the defendants possessed plants which afforded them an outlet for their own products and enabled them to compete with others in the fabricating market. We are not advised precisely when U. S. Steel and Bethlehem made their entry into the field, although it does appear that they did so at different times and much earlier than Kaiser. To the extent that the defendants possessed and maintained fabricating plants in combination with their business as producers they were organized alike and had extended their operations into another field of business. But those facts are innocuous for, as the Supreme Court unequivocally declared in United States v. Columbia Steel Co., 334 U.S. 495, 525, 68 S.Ct. 1107, 1123, 92 L. Ed. 1533 (1948), "vertical integration, as such without more, cannot be held violative of the Sherman Act."
 
 
 17
 Plaintiff vigorously asserts: (a) that all defendants supplied their own fabricating divisions with "huge tonnages" of steel while "starving" the independent fabricators in times of shortage; (b) that, by sacrificing their fabricating profit in bidding, they "squeezed the independent fabricator so that he could not obtain jobs" in times of free supply; and (c) that the defendants also, "as a regular practice," unfairly competed by "kiting bids" for subcontracts (that is, lowering their prior quotations to the general contractor after the close of the bidding) in order to take jobs away from competitors.[8] On these facts plaintiff concludes that "the scheme of defendants was to impair appellant's ability to compete rather than some lawful market objective."
 
 
 18
 It is questionable whether an inference of conspiracy can be drawn from the fact that several suppliers favor their wholly owned subsidiaries in the distribution of a scarce product since such action, even as a general practice, is not inconsistent with normal independent business methods. Dipson Theatres, Inc. v. Buffalo Theatres, Inc., 190 F.2d 951 (2d Cir. 1951), cert. denied, 342 U.S. 926, 72 S.Ct. 363, 96 L.Ed. 691 (1952). But we need not consider that question because no favoritism is apparent from the record. Defendants' plants were placed under restrictions equivalent to those imposed on the plaintiff. The restrictions were rigorously adhered to, even though they prevented defendants' plants from operating at anywhere near capacity. As a result the defendants were unable to bid or accept a number of jobs because of the scarcity of structural steel.[9]
 
 
 19
 Much of the plaintiff's evidence consists of statistics which indicate that the defendants shipped the plaintiff considerably less steel in 1955 than they shipped to their own division plants. But isolated figures and unadjusted comparisons cannot support the asserted discriminations, and any illusions that they create are quickly dispelled, for it also appears that defendants' fabricating plants were much larger than the plaintiffs; they carried on more extensive and varied operations than the plaintiff's and their individual fabricating capacities were far greater. To illustrate; the 1955 plant capacity of U. S. Steel's Consolidated Western Division, whose receipt of "huge tonnages" was repeatedly stressed by plaintiff, was estimated at 324,000 tons per year; Bethlehem Pacific's plant capacity was given as 51,500 tons and Kaiser's, 48-60,000 tons. On the other hand, plaintiff's estimated capacity was 15,555 tons.
 
 
 20
 Although plaintiff obtained less steel from the defendants in 1955 than in 1954, this was plainly due to the fact that plaintiff placed practically no orders until mid-year after defendants' rolling schedules were completely booked far ahead. Even so, it does appear that for the entire year 1955 plaintiff received more steel from defendants than in some prior years,[10] that the great bulk of the defendants' shipments to the West Coast went to independent fabricators,[11] that other fabricators were also placed on allocation and that over the years there has been a steady decrease in the defendants' shipments to their own plants but a corresponding increase in the percentage of defendants' production and tonnages of steel sold to other users.
 
 
 21
 In sum, the inference of a conspiracy among the defendants might have been permissible if plaintiff had submitted proof that the defendants' policies of distribution were aimed at plaintiff alone or that they were a mere subterfuge which, although ostensibly adopted in order to effect an equitable division of structural steel among fabricators generally, in fact resulting in the defendants securing a significantly greater share than they had received in the past. But this plaintiff failed to do.
 
 
 22
 It was stated earlier in this opinion that the defendants Bethlehem and Bethlehem Pacific were subsidiaries of Bethlehem Steel Corporation, that Bethlehem Pacific acted as sort of distributor for Bethlehem in the western United States, and that fabricators there were required to order from Bethlehem Pacific the eastern structural shapes and heavy plate which Bethlehem alone produced. Plaintiff's separate claim against these sister corporations is based upon the premise that the two participated together in manipulating this business arrangement in a manner which enabled Bethlehem Pacific to stifle competition between its own fabricating division and independent fabricators. Specifically plaintiff contends that "the allocation system imposed [by Bethlehem Pacific] upon the West Coast independent fabricators was worked out by conspiratorial, cooperative action."
 
 
 23
 Here again, although the particular charge is made against only two of the several defendants, plaintiff likewise relies upon the same type of evidence (and much the same evidence) that it urges establishes the larger conspiracy.
 
 
 24
 There is a measure of similarity evidenced in the policies these defendants adopted with respect to distribution of structural steel, and there is the additional fact that they were subsidiaries of a larger corporation and hence under common ownership; that is the most that can be said of the evidence tending to support plaintiff's claim. This falls short of the proof required to make out a prima facie case of conspiracy.[12]
 
 
 25
 We have already noted that business parallelism in itself is not indicative of a Sherman Act violation and the Supreme Court has made the same observation with respect to the fact of common ownership of corporations which transact business with one another. Thus, as said in United States v. Columbia Steel Co., 334 U.S. 495, 522-523, 68 S.Ct. 1107, 1121, 1122, 92 L.Ed. 1533 (1948) "in discussing the charge * * * [that a close working arrangement between the parent and the subsidiary corporation was evidence of an illegal combination] we said that the fact that the conspirators were integrated did not insulate them from the act, not that corporate integration violated the act. * * * When other elements of Sherman Act violations are present, the fact of corporate relationship is material and can be considered in the determination of whether restraint or attempt to restrain exists."
 
 
 26
 In its complaint plaintiff alleged a price fixing conspiracy, but offered no proof that defendants' prices were unreasonable or higher than those of other producers. On appeal plaintiff urges that the evidence did show "substantial price uniformity" and that this is additional proof that defendants conspired against plaintiff in making distribution. We have grave doubts concerning the validity of plaintiff's legal premise but need not resolve them here. Similarity of prices in the sale of standardized products such as the types of steel involved in this suit will not alone make out a prima facie case of collusive price fixing in violation of the Sherman Act, the reason being that competition will ordinarily cause one producer to charge about the same price that is charged by any other. United States v. International Harvester Co., 274 U.S. 693, 708-709, 47 S.Ct. 748, 71 L.Ed. 1302 (1927); Cement Mfrs. Protective Ass'n v. United States, 268 U.S. 588, 45 S.Ct. 586, 69 L.Ed. 1104 (1925).
 
 
 27
 Of course patterns of uniformity coupled with other related facts, as for example those in American Tobacco Co. v. United States, 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946), which disclosed that the "Big Three" of the cigarette industry somewhat simultaneously made a series of identical price changes, both up and down, without any economic justification and where the immediate effect was to stifle competition by smaller manufacturers, may constitute sufficient circumstantial evidence to support a factual conclusion that the acts were done in concert. But no comparable circumstances or other facts which cast a conspiratorial quality upon the defendants' pricing policies are revealed by this record. To the contrary the evidence at once shows both a decided lack of uniformity and an absence of interdependence among the defendants in this respect.[13]
 
 
 28
 By characterizing the sales and purchases of steel between defendants as "trades" the plaintiff attempts to impart a conspiratorial significance to what were in fact — so far as this record shows — no more than ordinary business transactions.[14] At least there is nothing of substance to suggest such reciprocity, for although each defendant was vertically integrated each maintained a separate and wholly autonomous division to carry on the business of production and that of fabrication and construction. And it appears the distinction was observed in practice; thus distribution of the plain material was under the sole control of the production division, which decided to whom material should be sold, and the fabricating division decided from whom to buy. All the defendants readily admitted that they sold each other material, and during the course of his examination Kaiser's sales manager actually volunteered the statement that Bethlehem Pacific was "a very fine account." But there was no direct testimony or any fact or circumstance tending to show that the defendants in their mutual dealings treated each other in any way except as buyers and sellers dealing at arm's length. Sales by one producer-fabricator in no way appeared geared to or conditioned upon purchases from another, nor does it appear that one party ever extended treatment to another party different from that accorded customers generally. What is apparent is that, if a defendant did not make a particular product or if because of a difference in freight charges, due to the location of the mill where the product was made, it was cheaper to buy from another producer, then the two dealt with each other, but on the same terms that were extended to all buyers.
 
 
 29
 Plaintiff's claims, based on charges of monopolization by the defendants severally, merit only brief comment. "Monopoly power" is an essential of such a claim. United States v. E. I. du Pont de Nemours & Co., 351 U.S. 377, 389, 76 S.Ct. 994, 100 L.Ed. 1264 (1956). Whether a defendant possessed this requisite power depends upon the degree of control the defendant could exert in a particular market. United States v. Consolidated Laundries Corp., 291 F.2d 563 (2d Cir. 1961); United States v. Aluminum Co. of America, 148 F.2d 416 (2d Cir. 1945). And the market is defined both by reference to a type of product or service and the geographical area in which the same is traded; section 2 of the Sherman Act has "both a geographical and distributive significance * * *." Indiana Farmer's Guide Publishing Co. v. Prairie Farmer Publishing Co., 293 U.S. 268, 279, 55 S.Ct. 182, 185, 79 L.Ed. 356 (1934); United States v. Columbia Steel Co., 334 U.S. 495, 510, 68 S.Ct. 1107, 92 L.Ed. 1533 (1948). Here the trade area was settled by stipulation, but the total amount of trade in structural steel does not appear.
 
 
 30
 Of course, monopoly power need not be shown in order to warrant a finding of an attempt to monopolize. However, "where acts are not sufficient in themselves to produce a result which the law seeks to prevent — for instance, the monopoly — but require further acts in addition to the mere forces of nature to bring that result to pass, an intent to bring it to pass is necessary in order to produce a dangerous probability that it will happen. * * * (Citation omitted). But when that intent and the consequent dangerous probability exist, this statute, like many others and like the common law in some cases, directs itself against that dangerous probability as well as against the completed result." Swift & Co. v. United States, 196 U.S. 375, 396, 25 S.Ct. 276, 279, 49 L.Ed. 518 (1905).
 
 
 31
 Thus, to make out a prima facie case plaintiff was required to produce proof that a defendant's acts were not "predominantly motivated by legitimate business aims" [Times-Picayune Publishing Co. v. United States, 345 U.S. 594, 626-627, 73 S.Ct. 872, 890, 97 L.Ed. 1277 (1953)], but instead were done in order to gain monopoly power. The acts themselves may be such as to suggest an illegal purpose, or they may require the assistance of additional facts; in either event the intent must be reasonably apparent. Here it is not.
 
 
 32
 The steel shortage in 1955 and its causes have already been mentioned in discussing plaintiff's charges of conspiracy. Much of what was said there is also pertinent to the contention that each defendant was seeking "monopoly power." Rationing appears to have been no more than a move to meet the sudden change in the current business climate. The effect was to divide production among all customers, including the defendant's own fabricating divisions, equitably and in a manner which maintained relative equality among all fabricators; neither the policies nor the manner in which they were carried out permit any implication that a defendant resorted to rationing in a calculated effort to exclude from competition independent fabricators. True, some fabricators might have profited more without artificial controls but, under the circumstances, that fact does not suggest an intent to monopolize.
 
 
 33
 In addition to its argument that each defendant attempted to monopolize the general market for structural fabrication, plaintiff makes the more limited assertion that the evidence tends to show that U. S. Steel sought to gain control of the market for making freight car underframes and that Bethlehem did likewise with respect to multi-storied buildings. These latter arguments proceed from the fact that the principal producer of Z bars and the principal source of supplies of wide flange beams were respectively U. S. Steel and Bethlehem Pacific. Beyond this point plaintiff's conclusions lack support. We are left to speculate whether there was a distinct economic market for this product and, if so, the extent of that market. In addition, the allocation systems imposed by these two defendants do not alone evidence intent to monopolize and we see no additional proof that is relevant to that issue.
 
 
 34
 It appears that during 1955 U. S. Steel obtained three orders from Southern Pacific Company for 2500 freight car underframes, and plaintiff one for 500 frames. But in each instance the contracts were awarded to the best bidder, after competition, in full compliance with the provisions of a statute and regulations of the Interstate Commerce Commission. Moreover, plaintiff makes no complaint that U. S. Steel's success was due to grossly unfair pricing or a resort to unfair business practices.
 
 
 35
 With respect to the practices of Bethlehem Pacific the same observations must be made. And we fail to see any force to plaintiff's argument that Bethlehem Pacific was able to secure "most" of the multi-storied buildings jobs and, on one occasion, was given a large contract without competitive bidding. Business success, without more, does not indicate an intent to monopolize.
 
 
 36
 Section 10 of the Clayton Act, on which plaintiff's third cause of action is based, makes it unlawful for a common carrier to purchase supplies in an amount of more than $50,000 from another corporation when the same person is a member of the board of directors of both corporations; an exception is permitted if the purchase is made the subject of competitive bidding and the bid most favorable to the carrier is the one accepted. The section contains a further provision that "Any person who shall, directly or indirectly, do or attempt to do anything to prevent anyone from bidding, or shall do any act to prevent free and fair competition among the bidders or those desiring to bid, shall be punished as prescribed in this section * * *."
 
 
 37
 The keystone of plaintiff's claim is the fact that during 1955 James B. Black was a director of both the Southern Pacific Company and U. S. Steel. During that year Southern Pacific on several occasions solicited bids for the underframes of freight cars which it intended to assemble in its own shops at Sacramento, California. It awarded all the contracts to U. S. Steel, except on the last occasion; at that time plaintiff was the low bidder but Southern Pacific's purchasing agent, doubting that plaintiff could secure enough material to fill the order, awarded a contract for only 500 of the 1500 frames to plaintiff and placed the remainder of the order with U. S. Steel.
 
 
 38
 Plaintiff does not contend that Southern Pacific failed to comply with all bidding procedures required by this statute and the supplemental regulations of the Interstate Commerce Commission, or that the bids which it accepted were not the most favorable. Rather, plaintiff directed its complaint against U. S. Steel and took the position that by making "impossible allocations" of shapes — and hence Z bars — U. S. Steel committed a violation of the portion of Section 10 quoted above, and for which it was liable in a civil action for damages.[15]
 
 
 39
 Section 10 represents a Congressional effort to protect common carriers from being overreached in purchases of securities, supplies or other articles of commerce from other corporations in those instances where the interests of their own officers and representatives are conflicting. Dealings between the two such corporations are not prohibited, but the object of fairness is thought to be achieved by requiring that the purchase be made the subject of competition and be from the corporation whose bid is most favorable to the carrier. Minneapolis & St. L. Ry. v. United States, 361 U.S. 173, 190, 80 S.Ct. 229, 4 L.Ed.2d 223 (1959).
 
 
 40
 Plaintiff's contention, if correct, would engraft on the section the additional condition of cooperation between bidders. As U. S. Steel points out, "section 10 nowhere contains any provisions creating obligations on the part of a supplier to deal with competing suppliers, to extend favors to them or to refrain from doing something in the normal course of business that somehow might hamper them." and we should add that nothing in its legislative history indicates such a construction.[16]
 
 
 41
 Plaintiff further assigns as error the court's rulings regarding the admission of evidence.
 
 
 42
 Part of such evidence consisted of proof of the manner in which U. S. Steel and Bethlehem had distributed steel to plaintiff and others prior to 1955, the period in issue. Plaintiff's counsel, at a pre-trial conference, stated that this would be offered as collateral proof of plaintiff's charges of conspiracy and monopolization[17] and that it related to 28 jobs carried on from 1950 through 1954. The judge, however, demurred, observing that the evidence was of limited use and that its introduction would require a tremendous amount of trial time. Thereupon counsel, stating that they could reduce the number, selected nine of the jobs initially proposed. However, the judge considered that nine were too many and, by pre-trial order, limited plaintiff to proof of two — the so-called 13th Street Freeway job undertaken by plaintiff in 1953, and the University of California Teaching Hospital job performed by the Moore Dry Dock Company.
 
 
 43
 The admission of collateral evidence is a matter addressed to the discretion of the trial judge [United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 230, 60 S.Ct. 811, 84 L.Ed. 1129 (1940)], and we are clear that here the rulings complained of did not constitute an abuse of discretion.[18]
 
 
 44
 In the words of Justice Holmes, the reason for excluding such evidence is "a purely practical one, — a concession to the shortness of life." Reeve v. Dennett, 145 Mass. 23, 28, 11 N.E. 938, 944 (1887). It is manifest from the transcript of the pre-trial conferences, where the subject was discussed at length, that an excursion into each of these incidental matters could and probably would result in a tremendous proliferation of proof which would literally overwhelm the jury with diversionary facts and extend the trial interminably. The Judicial Conference of the United States, in its Report on Procedure in Anti-trust and Other Protracted Cases (1951), has frowned upon a liberal exercise of judicial discretion in allowing collateral proof saying "Such evidence as is merely `possibly helpful', or which merely supplies `atmosphere' or `background', may be rigidly excluded," a view to which we heartily subscribe.
 
 
 45
 Moreover, in addition to conservation of judicial time, there was a further factor in this particular suit that the trial court could properly consider in arriving at its ruling. A number of the 28 jobs were those awarded plaintiff. Prior to the commencement of the suit, plaintiff had initiated a series of actions against U. S. Steel, Bethlehem Pacific, and others, seeking damages for anti-trust law violations. These actions had culminated in a settlement by the terms of which plaintiff released the defendants from all claims up to January 1, 1955; while the release would not render the facts constituting such claims inadmissible, it did nullify them as the basis for an award of damages. But how far a jury in a case of this magnitude could keep that fact in mind, although carefully admonished to do so, is at least problematical.
 
 
 46
 Another item of pre-1955 proof which the plaintiff now urges should have been admitted rather than excluded by the court's pre-trial order, was the deposition of one Walter B. Thomson. The contents appear irrelevant, but we need not pass on that objection because the record clearly shows that plaintiff invited the ruling. When the deposition was under discussion at a pre-trial conference the court commented that it appeared Thomson was not engaged in structural fabrication but was seeking to enter into a different branch of the steel business than plaintiff — that is, warehousing of steel and manufacturing of tanks; and that his operations would be carried on in and around Dallas, Texas, outside the trade area involved in this suit. Thereupon counsel spoke up saying "Why not limit it, then, your Honor, to the local people, Moore Drydock and their experience, and Herrick Iron Works and their experience, and Murphy —."
 
 
 47
 The pre-trial order further rejected other items of pre-1955 proof, consisting of two documents duly authenticated by the Archivist of the United States as copies of records of the War Production Board. Defendants' objection to them was general and that they constituted hearsay.
 
 
 48
 The first of these proposed exhibits was titled "Summary of Meeting" (held March 27, 1946) of the Iron-Steel Advisory Committee of the Civilian Production Administration of the United States. It contained the statement that the purpose of the meeting was "to consider ways of alleviating various critical problems that have arisen as a result of the present steel shortage"; that Charles Halcomb, head of the Steel Branch was the Government Presiding Officer, and that John D. Small, Administrator of the C.P.A., addressed the group, which consisted of the Committee composed of representatives of numerous steel companies, (including these defendants) and participated in the ensuing discussion. It contains a further recital that "The industry is voluntarily following a pattern of distribution based on historical usages during 1940-41 and is doing its best to divide available supplies fairly among traditional users, the Committee said."
 
 
 49
 The second of the proposed exhibits is titled, "Interim Report on Operations," submitted by the Steel Branch of the same agency, dated October 14, 1946. It contains a statement similar in tenor to the one quoted from the Summary. Neither document is signed.[19]
 
 
 50
 We find it unnecessary to appraise the probative worth of either document because neither contained anything but inadmissible hearsay. The official document exception to the hearsay rule is codified as 28 U.S.C. § 1733.[20] "Generally stated, the rule is that all documents prepared by public officials pursuant to a duty imposed by law or required by the nature of their offices are admissible as proof of the facts stated therein. * * * [citation omitted]. Since the official documents are a substitute for the personal appearance of the official in court, it is generally held that such documents, to be admissible, must concern matters to which the official could testify if he were called to the witness stand. * * * [citation omitted]. Thus, this circuit * * * [has] held that the facts stated in the document must have been within the personal knowledge and observation of the recording official or his subordinates, and that reports based upon general investigations and upon information gleaned second hand from random sources must be excluded." Olender v. United States, 210 F.2d 795, 801, 42 A.L.R.2d 736 (9th Cir. 1954).
 
 
 51
 The foundation essential to the admission, as official documents, of these proposed exhibits was entirely lacking. Granting that the Civilian Production Administration required that minutes be kept of meetings of its Industry Advisory Committee and that the making of reports, such as the one tendered by plaintiff was one of the duties of that agency,[21] nevertheless it was incumbent upon plaintiff to establish who was responsible for their preparation in order to determine whether they were "within the personal knowledge and observation of the recording official or his subordinates" and whether the same were accurate and correct accounts of what occurred. Here there was nothing to show who kept the "minutes" or who authorized the report; in addition it was not shown when they were prepared or the source of the writer's information. Small was not only unable to provide this foundation, but he emphatically denied that the version contained in the minutes truly or correctly reflected any statements regarding the steel producers' policies and he further stated that at no time during the meeting was anything said about an agreement among producers.
 
 
 52
 Similarly, Halcomb was unaware of the existence of the Report and he too declared that the same was incorrect in respect to the portion under consideration.
 
 
 53
 Other items of evidence which the court excluded related to violations of the anti-trust laws which the plaintiff asserts U. S. Steel committed in the period after November 28, 1955, the date the action was commenced, and principally jobs to construct freight car underframes for the Southern Pacific Company and Pacific Fruit Express Co.
 
 
 54
 The substance of this evidence apparently[22] would have been to the effect that in early 1956 plaintiff, although the low bidder, was not awarded a contract because the Southern Pacific Company doubted plaintiff would be able to buy enough steel from U. S. Steel, and likewise that on several occasions in that year and in 1957 plaintiff was prevented from bidding various jobs because U. S. Steel refused to fill plaintiff's orders. It is of course elementary that plaintiff could not recover damages for injuries resulting from tortious conduct not comprehended by its complaint. In The Flintkote Co. v. Lysfjord, 246 F.2d 368 (9th Cir. 1957) cert. denied, 355 U.S. 835, 78 S.Ct. 54, 2 L.Ed.2d 46, a case quite similar to the one at bar, this court, during the course of an extended discussion concerning the nature of and basis for a claim founded on a conspiracy, declared, "Plaintiffs' injuries were not caused just by the announced refusal but rather resulted from the explicit refusal coupled with the implied persistence in the announced course of conduct," [Id. 246 F.2d at 395] a course which defendant "was under no legal duty to [continue but] * * * on the contrary, * * * was at all times completely free to reconsider * * *." Ibid. And we quoted with approval the following passage from Momand v. Universal Film Exchange, Inc., 43 F.Supp. 996, 1006 (D.Mass.1942).
 
 
 55
 "Each time the plaintiff's interest is invaded by an act of the defendants, he has a new cause of action. For that particular invasion he is at once entitled to recover as damages, not only for the injuries he suffers at once, but also for those he will suffer in the future from that particular invasion, including what he has suffered during and will suffer after the trial. Lawlor v. Loewe, 235 U.S. 522, 536, 35 S.Ct. 170, 59 L.Ed. 341. But he can not at once recover for anticipated invasions, even though they are of the same general character as those he has already sustained."
 
 
 56
 Accord, Connecticut Importing Co. v. Frankfort Distilleries, 101 F.2d 79 (2d Cir. 1939).
 
 
 57
 These principles are applicable here. Plaintiff could recover only for such damages as were the consequences of the acts of a defendant or the defendants committed prior to the time the complaint was filed; plaintiff's proof evidently would have been of subsequent acts. We are of course aware of the well settled proposition that proof of other acts is relevant and admissible provided they are so related in character and time to the transaction in issue as to tend to show the existence of a plan or the character of the latter. Wood v. United States, 16 Pet. 341, 41 U.S. 341, 10 L. Ed. 987 (1842); N. L. R. B. v. Pacific Greyhound Lines, Inc., 91 F.2d 458 (9th Cir. 1937), rev'd on other grounds, 303 U.S. 272, 58 S.Ct. 577, 82 L.Ed. 838 (1938). And the Supreme Court has held this limitation on the general rule excluding collateral proof applies to subsequent as well as prior acts. F. T. C. v. Cement Institute, 333 U.S. 683, 704-705, 68 S.Ct. 793, 92 L.Ed. 1010 (1948). Here the evidence being beyond the issues was admissible, if at all, only for a very limited purpose. But the record makes clear the fact that during pre-trial discussion and at the trial, plaintiff took the position that this proof (whatever it was) should be allowed as a basis for damages.[23]
 
 
 58
 On appeal plaintiff may not base error on the fact that evidence offered for one purpose and properly rejected by the trial court may have been admissible for another purpose for which it was not offered. See Standard Oil Co. of Cal. v. Moore, 251 F.2d 188, 217-218 (9th Cir. 1957), cert. denied, 356 U. S. 975, 78 S.Ct. 1139, 2 L.Ed.2d 1148 (1958).
 
 
 59
 After the case was set for trial the court conducted a final series of pre-trial conferences for the purpose of ascertaining the nature of the proof and to settle the trial agenda. At one of these meetings plaintiff's counsel took the position and asserted that plaintiff was not only entitled to recover for injuries resulting from wrongful acts committed up to the date the complaint was filed, but also for injuries resulting from acts subsequently committed in the interim up to the time of trial, an additional period of over three years. The court, however, after carefully and correctly pointing out that in a civil suit brought under the antitrust laws the injury rather than the conspiracy is the gist of the claim, stated that the commencement of the action marked the cut-off date of any acts for which plaintiff might recover damages.[24]
 
 
 60
 Before the next meeting, plaintiff filed a formal motion for leave to file a "Third Amended and Supplemental Complaint." In this pleading appeared claims separate from and in addition to those which were initially the subject of plaintiff's action. Even though the new claims were of the same nature as the others, they were based on later acts and hence defendants manifestly were entitled to a fair opportunity to prepare a defense. Plaintiff's counsel vigorously argued that the defendants had already engaged in extensive discovery and taken numerous depositions covering all facts which would in any way be relevant to these additional issues. Defendants' counsel, on the other hand, opposed the motion, pointing out that their entire investigation and preparation had been made to meet the more limited charges. They also urged that plaintiff offered no valid justification for the delay. In addition they took the position that the supplemental complaint was defective in substance, a ground we find unnecessary to consider since it is apparent to us that the trial court could have properly rested its ruling on the sole ground that the motion was untimely.
 
 
 61
 After thoughtfully considering each of plaintiff's remaining points we believe that the only ones having sufficient merit to warrant discussion relate to the matters of expert witnesses and costs.
 
 
 62
 Plaintiff took the deposition of Theodore John Kreps, a distinguished economist, for use as evidence. Prior to trial, however, the defendants moved for its exclusion on the grounds of irrelevancy, and a judge (other than the one before whom the case was tried) entered this order: "The defendants are charged with a violation of the antitrust laws, not with a violation of scientific principles affecting the conditions and laws of production * * *. The case, therefore, will be tried upon legal principles, not economic ones. Should it become apparent upon the trial that the testimony of an economist would be of assistance to the court and jury, the court will in the exercise of its discretion call an expert of its own or one chosen by mutual consent of counsel. * * * The deposition of Dr. Theodore J. Kreps is stricken from the record." We think that the judge erred in striking the entire deposition. It is true that much of its contents consisted of the deponent's abstractions in the field of economics, together with his opinions on issues of law, but nevertheless some of his conclusions were within the province of a skilled witness and to that extent would have been admissible.
 
 
 63
 However, it is not apparent that the ruling was in any way prejudicial. Moreover, at the trial plaintiff neither called nor requested the court to call an expert witness, nor did it lay the foundation necessary to the use of the Kreps deposition in order that it might offer the portions which were admissible. See generally Fed.R.Civ.P. 27(a) (4) and 26(d) (3).
 
 
 64
 With respect to costs, plaintiff contends (1) that the defendants waived their right to any costs at all and (2) in the alternative, that the sums assessed were excessive.
 
 
 65
 (1) Rule 23 (now Rule 46) of the local Rules of the court below, requires a party entitled to costs to serve on his opponent and file with the clerk of the court within five days "after notice of the entry of a judgment" a bill of costs, and makes noncompliance a waiver of the right; Rule 58 of the Federal Rules of Civil Procedure, in part, provides that "Unless the court otherwise directs * * *, judgment upon the verdict of a jury shall be entered forthwith by the clerk * * *. When the court directs that a party recover only money or costs or that all relief be denied, the clerk shall enter judgment forthwith upon receipt by him of the direction * * *. The notation of a judgment in the civil docket * * * constitutes the entry of the judgment * * *."
 
 
 66
 In the case at bar the judge, immediately following argument, orally announced his ruling granting defendants' motions for directed verdict, and then addressed the clerk, saying "you will then enter a directed verdict in favor of each defendant on each claim to which it is a party." The pertinent docket entries on that date and thereafter read as follows:
 
 
 67
 "Aug. 28 — Further trial (hearing on motions for directed verdict). Arguments heard and motions granted * * *.
 
 
 68
 "Sept. 30 — Filed opinion of Court (motion of defendants for directed verdict granted * * *). * * * Mailed copies to counsel. (Counsel for defendants notified to prepared [sic] judgment).
 
 
 69
 "Oct. 8 — Filed statement of plaintiff of reasons for disapproval of form of judgment submitted by defendants.
 
 
 70
 "Oct. 21 — Entered judgment — filed October 21, 1959 — for defendants * * *. * * * Mailed notices.
 
 
 71
 "Oct. 23 — filed memorandum [a] of costs * * *."
 
 
 72
 Essentially plaintiff's position is that the court's ruling on August 28 amounted to the final judicial act which became effective as the judgment when noted in the judgment docket by the clerk, with the result that defendants' cost bills were filed out of time and should have been disallowed in their entirety. In support of its argument, plaintiff relies principally upon Edwards v. Doctors Hosp., Inc., 242 F.2d 888 (2d Cir. 1957), cert. denied, 356 U.S. 930, 78 S.Ct. 770, 2 L.Ed.2d 761 (1958). There the question was, when did the time for appeal commence. It appears from the opinion that the trial judge had directed a verdict and ordered the suit dismissed. The clerk immediately made a docket entry to that effect; two weeks later the judge signed a formal judgment. Concluding that the judge's determination, followed by the docket entry, decided the case with finality, the Second Circuit held a notice of appeal filed more than thirty days afterward came too late. But such a conclusion is impermissible in this case. Here, the district judge did not order the suit dismissed, nor direct the clerk to enter judgment for defendants. Indeed that order would have been premature, since plaintiffs still were entitled to, and thereupon did, make a record upon the issue of damages. That the case was regarded by the judge as still open is clear, for he stated in the course of his ruling that he proposed to render a written opinion subsequently. "Under such circumstances it should be permissible to look at what the judge and clerk did later. And when we do so, we find that the record they made * * * shows unmistakable intent by the district judge to make a judgment [at a later time]." Cedar Creek Oil & Gas Co. v. Fidelity Gas Co., 238 F.2d 298 (9th Cir. 1956), cert. denied, 356 U.S. 932, 78 S.Ct. 775, 2 L.Ed.2d 763 (1958); Accord, United States v. F. & M. Schaefer Brewing Co., 356 U.S. 227, 235, 78 S.Ct. 674, 2 L.Ed. 2d 721 (1958).
 
 
 73
 Moreover, local Rule 21 (now Rule 44) of the District Court requires that a judgment must be embodied in a written instrument signed by the judge before an entry of judgment can be validly made by the clerk. The rule specifically provides that "The entry in the docket of the judgment settled and signed by the judge will constitute the entry of judgment as provided by F.R.C.P. Rules 58 and 79a. Where written order of judgment is to be prepared by counsel and settled, no memorandum of decision or opinion or any minutes made by the Clerk of the Court's decision shall constitute entry of judgment under said Rules." The judge did sign a judgment on October 21 and, as the above extract from the docket shows, an entry to that effect was then made as contemplated by the Rules. It appears that the court was adhering to its rules and we conclude the bills were properly before the court.
 
 
 74
 (2) The court below, on plaintiff's motion followed by a hearing as provided by Fed.R.Civ.P. 54(d) retaxed some of the expenses claimed as costs by the defendants, but allowed defendants the expense of copies of pre-trial and trial transcripts, as well as copies of depositions.
 
 
 75
 Plaintiff does not make entirely clear the ground or grounds of objection to these allowances, but urges that they were "contrary to accepted practice" and for items secured "for the convenience of the parties or counsel." As we understand, plaintiff complains first that the court lacked power to tax these expenses as costs and second, granting power, the allowances constituted an abuse of discretion.
 
 
 76
 In the much cited case of Stallo v. Wagner, 245 F. 636 (2d Cir. 1917) the second circuit held that the expense of a trial transcript purchased by a party for his own use could not be taxed as costs. The court stated that no statute or rule in effect at that time expressly or by implication authorized the allowance. The only relevant statute was the Fee Bill of 1853, 10 Stat. 168 (1853), which provided that "fees * * * for * * * copies of papers necessarily obtained for use on trial" were taxable, and the only other pertinent provision on the books was Equity Rule 50, which authorized the court to appoint a stenographer to "take down testimony in shorthand and, if required, transcribe the same," his fee to be fixed by the court and taxed as costs. The court decided that the statutory phrase, "copies of papers necessarily obtained for use on trial," did not include a trial transcript obtained by a party and that the equity rule did not extend to any transcript save the original required by the court. Some courts, concluding that no changes have been made in this area since Stallo was decided, currently declare that expenses for copies cannot be taxed under any circumstances.[25] However, we think that material changes have been made in the rules and statutes which are sufficient to confer upon courts the power to tax such expenses.[26]
 
 
 77
 Our conclusion is not new; in Kemart Corp. v. Printing Arts Research Labs, 232 F.2d 897, 57 A.L.R.2d 1234 (9th Cir. 1956), we held an allowance of such fees was within the discretion of the trial court. And again in A.B.C. Packard, Inc. v. General Motors Corp., 275 F.2d 63 (9th Cir. 1960) we reached the same conclusion upon an extended discussion.
 
 
 78
 We likewise conclude that the trial judge had the power to tax the expense of copies of the depositions. This question was exhaustively considered in Perlman v. Feldmann, 116 F.Supp. 102 (D.Conn.1953). We agree with that case that the grant of such power is "implicit in 28 U.S.C.A. § 1920(2)," [id. at 109; see also Cooke v. Universal Pictures Co., 135 F.Supp. 480 (S.D.N.Y.1955)], qualified only by the requirement of that statute that the various copies be "necessarily obtained for use in the case."[27] Weiss v. Smith, 103 F.Supp. 736 (D.Conn. 1952); Bank of America v. Loew's Int'l. Corp., 163 F.Supp. 924 (S.D.N.Y.1958).
 
 
 79
 Here there is no doubt that the pre-trial and trial transcripts were reasonably necessary. This case was unusually involved and complex by any standard, even by those in the field of antitrust litigation. The complaint named ten defendants, who made up a veritable Burke's Peerage of the steel industry. It embraced the three claims mentioned earlier and concluded with a prayer for damages totaling nearly $14,500,000, plus attorneys' fees. Fifteen pre-trial hearings were held during the nearly four years in which the action was pending; they covered a multitude of matters, including advisory rulings by the court, discussion of issues and the trial agenda; they ranged from an hour or less to several days in duration. The trial itself, although prematurely brought to an end, extended over a period of approximately six weeks and occupied in excess of thirty full trial days. The need of counsel for a complete, accurate, and readily available record of all these proceedings, both those during and before the actual trial, is readily apparent even when the matter is viewed from this rather remote position. Taxation of the transcript expense was fully justified.
 
 
 80
 We do experience some uncertainty over the propriety of the district court's allowance of fees for copies of depositions. This is not due to the fact that the originals were all on file in the office of the clerk.[28] Rather, our difficulty arises from the fact that (a) none of the depositions taken by defendants, numbering fifteen in all, was introduced in evidence, and (b) defendants' need for copies of the fifty-seven taken by plaintiff is not made readily apparent.
 
 
 81
 (a) If the depositions were merely useful for discovery then they were not taxable items and their expense should have been borne by the party taking them, as incidental to normal preparation for trial. Republic Mach. Tool Corp. v. Federal Cartridge Corp., 5 F.R.D. 388 (D.Minn.1946). The record does show that the defendants used some of them for impeachment, and this would clearly qualify them for consideration. Had the issue of damages been actually tried, the remainder might have been similarly employed. Their allowance following a hearing constitutes an implied finding that the expense was properly taxable; a transcript of that hearing was not included in the record on appeal, and thus we have no basis to review the trial court's determination.
 
 
 82
 (b) Defendants' expenses for copies of depositions taken by plaintiff present a somewhat different problem. Many of the deponents were officers and employees of the defendants and were, or might have been, available as witnesses at the trial. In Hancock v. Albee, 11 F.R.D. 139 (D.Conn.1951) the expense of a copy of a party's own deposition taken by an adversary was allowed as costs. The court said the possibility that the deposition would be used to impeach the party created a reasonable necessity for his purchase of a copy in order to hold the impeachment within proper limits. The precise basis for the trial court's ruling in this case does not appear, and we cite Hancock to demonstrate that the same, or some other equally valid basis, may have existed to justify the court's allowance of these items.
 
 
 83
 No reversible error appearing, the judgment is affirmed.
 
 
 
 Notes:
 
 
 [1]
 The issues of liability and damages were severed for hearing. After plaintiff completed its proof on liability the defendants moved for directed verdicts, and the court stated the motion would be granted, but only after plaintiff had rested its entire case. However, the parties then stipulated plaintiff's proof on damages and thereupon further stipulated that the jury rendered verdicts against the plaintiff pursuant to the court's direction
 
 
 [2]
 The defendants were United States Steel Corporation, Bethlehem Pacific Coast Steel Corporation, Bethlehem Steel Company, Kaiser Steel Corporation, Jones & Laughlin Steel Corporation, National Steel Corporation, Republic Steel Corporation, Armco Steel Corporation, Youngstown Sheet and Tool Company, and Inland Steel Company, as well as two defendants referred to by the fictitious style and description of "Black and White Company," and "Green and Red Company."
 
 
 [3]
 38 Stat. 734 (1914), 15 U.S.C. § 20 (1958). This section, so far as pertinent, reads: "No common carrier engaged in commerce * * * shall make or have any contracts for construction or maintenance of any kind, to the amount of more than $50,000, in the aggregate, in any one year, with another corporation * * * when the said common carrier shall have upon its board of directors * * * any person who is at the same time a director * * * of * * * such other corporation * * * unless and except such purchases shall be made from, or such dealings shall be with, the bidder whose bid is the most favorable to such common carrier, to be ascertained by competitive bidding under regulations to be prescribed by rule or otherwise by the Interstate Commerce Commission. * * *
 "Any person who shall, directly or indirectly, do or attempt to do anything to prevent anyone from bidding, or shall do any act to prevent free and fair competition among the bidders or those desiring to bid, shall be punished as prescribed in this section * * *."
 This third count also contained allegations to the effect that U. S. Steel and the Southern Pacific Company had conspired to restrain trade in the manufacture of freight car underframes; but prior to trial plaintiff expressly abandoned any such claim.
 
 
 [4]
 In spite of the higher cost, U. S. Steel's fabricating divisions on the West Coast ordered all wide flange and plate from their own mills
 
 
 [5]
 Bethlehem Pacific's quotas covered both wide flange and heavy plate. It is true that it did use 1954 as the base year in setting customers' quotas for heavy plate, but it sold very little of that material
 
 
 [6]
 U. S. Steel used the base years, 1953, 1954 and the first half of 1955, in its allocation formula
 
 
 [7]
 U. S. Steel expressly offered to roll plaintiff's allotted tonnage into Z bars but plaintiff declined
 
 
 [8]
 Plaintiff explains that underbidding was economically feasible because defendants "are making a dual profit — one profit on the sale of the plain material and a second profit on the fabrication of the plain material. Appellees can sacrifice their fabricating profit to insure that they will make a profit on the plain material." The authors of a well reasoned article [Kessler & Stern, Competition, Contract, and Vertical Integration. 69 Yale Law Journal 1 (1959)] violently disagree with plaintiff's contention as a valid economic proposition. But of course we are not interested in the merits of that matter; what is important and fatal to this facet of plaintiff's argument is that at the very most the evidence shows Bethlehem Pacific underbid with respect to what plaintiff referred to as the "building for the Department of Unemployment" in Sacramento, California. Bethlehem Pacific bid the job at a loss. But even assuming this isolated instance constituted an unfair business practice, it in no way involved the other defendants
 The proof relied upon to show "kiting" likewise disclosed nothing for the jury to appraise. Plaintiff bid 835 jobs during 1955, yet it could cite only two instances of so-called "kiting." Thus on one occasion Kaiser made a tardy bid in an attempt to secure a subcontract for which plaintiff was the low bidder, and on another occasion Bethlehem Pacific reduced its offer after the bidding was closed. But in both instances plaintiff was awarded these subcontracts.
 
 
 [9]
 The defendants' shipments to their plants did not represent a significant increase over the shipments which were made during times of free supply of steel. To the contrary, Bethlehem Pacific's and Kaiser's western shops received less steel from their parents in 1955 than they had customarily received in most prior years
 
 
 [10]
 
 Plaintiff's purchases
 in tons from: 1955 1954 1953 1952 1951 1950

 U. S. Steel 3659 4034 2892 4521 1263 559
 Bethlehem Pacific 2733 4943 6535 4157 1924 2459
 Kaiser 1072 3720 3138 1155 1304 195
 
 
 [11]
 
 Shipments Shipments Shipments
 to to own to other
 plaintiff. divisions. fabricators.

 U. S. Steel 3659 71,367 410,747
 Bethlehem Pacific 2733 35,154 166,633
 Kaiser 1072 11,464 50,860*
 
 
 *
 The tonnage actually shipped is not disclosed but Kaiser offered the amount indicated in the chart to customers in the last eight months of 1955
 
 
 [12]
 We have carefully examined the entire record, including the portions cited by plaintiff. What appears is that Bethlehem suggested that Bethlehem Pacific limit customers' purchases to the amounts each had purchased in 1954; however the evidence is uncontroverted that Bethlehem Pacific did not follow this suggestion (see note 5supra and accompanying text). And plaintiff also mistakes the evidence relative to the allocations of steel to fabricators. Plaintiff argues that during 1955 the tonnage of steel sent by Bethlehem to Bethlehem Pacific shops was grossly disproportionate to the amount made available to the trade generally, and that in the third quarter of 1955 Bethlehem Pacific's shops received 13,652 tons of wide flange shapes; it then argues that independent fabricators in the entire area received but 9000 tons of this type of steel. This latter figure is arrived at through a clear misunderstanding of the testimony of Jesse V. Honeycutt, Bethlehem's Vice President in charge of sales. Honeycutt stated that Bethlehem's shops nationally used "16 or 17 percent" of the wide flange that Bethlehem produced. He then said that approximately 60% of all steel shipped to Bethlehem Pacific's fabricating shops consisted of wide flange beams; but plaintiff apparently understood the testimony to be that 60% of all shipments of wide flange beams to that area were to Bethlehem Pacific's shops. If plaintiff's version of the testimony was correct, then of course the total tonnage of wide flange material was 22,753 tons of which Bethlehem Pacific kept 13,652 tons and sold the remaining 9,101 tons. A further exhibit, however, shows that Bethlehem shipped to "western trade customers" in the quarter mentioned 39,847 tons of "structural shapes."
 
 
 [13]
 For example, take the testimony of E. T. Weir, Board Chairman of National Steel Corporation, J. L. Ashby, a vice president and general manager of Kaiser, and C. F. Borden, Kaiser's Vice President for sales, which plaintiff stresses
 Weir's statements in substance were that U. S. Steel generally took the lead in making prices but "that doesn't mean that there has not been a cutting of prices and things of that kind" by other producers; those of Ashley were to the same effect with the addition that Kaiser generally met competition although prices for its products often varied from those of other producers; Borden's were essentially the same as the others and further disclosed a significant instance in 1948 when Kaiser had charged substantially more ($30.00 per ton) than the others for one kind of ordinary structural steel. In addition there is the testimony of C. D. Anderson, plaintiff's own purchasing agent who, after acknowledging that the difference of $1.00 per ton was material in determining from whom to buy, admitted that the mill base prices charged by the respective defendants for the types of material during the period in question was as shown in the following table:
 Mills and Wide Flange
 Location & Structural Plate

 Bethlehem Per Ton Per Ton
 Bethlehem, Pa. $ 86.00 --
 Lackawanna, Pa. 86.00 --
 Johnstown, Pa. 86.00 --
 Seattle, Wash. -- $103.00

 U. S. Steel
 Munhall, Pa. $ 85.00 $ 84.50
 So. Chicago, Ill. 85.00 84.50
 Clairton, Pa. 85.00 84.50
 Torrance, Calif. 99.00 85.50
 Pittsburg, Calif. -- 84.50
 Geneva, Utah -- 84.50

 Kaiser
 Fontana, Calif. $105.00 $ 97.50
 
 
 [14]
 In the brief plaintiff iterates and reiterates that such were the dealings, saying for example, "Mr. Honeycutt [Bethlehem's vice president in charge of sales] admitted that U. S. Steel trades off to Bethlehem and that they deal in similar amounts to each other. * * * All of this policy of trading off steel among competitors in times of tight supply is contrary to elementary economic principles. * * * Such conduct is not the conduct of true competitors and the jury would be warranted in drawing inferences of collusion and conspiracy from this entire trading-off system." Plaintiff's assertion, like many of its other contentions, is entirely lacking in evidentiary support and such unfounded statements make a review of this record much more difficult than it otherwise would be. Instead of admitting trades, Honeycutt flatly denied any took place; the suggestion came from counsel, as the following extract from the record demonstrates:
 "Q. (By plaintiff's counsel). How about U. S. Steel, does your fabricating shop in Chicago buy from the United States Steel Corporation?
 A. (Honeycutt) Yes, sir.
 Q. Then do you trade off with U. S. Steel by reason of that, to give them steel where they have a more favorable freight situation in other spots.
 A. It isn't what I call a trade-off We buy from them and they buy from us."
 
 
 [15]
 By motion and answer U. S. Steel raised as an issue of law the question of whether a private cause of action for stifling bidding lies under this section — a question which was left unanswered below because in the opinion of the trial court the record did not show that U. S. Steel was guilty of any unlawful conduct. We agree with that appraisal of the evidence and go no further
 
 
 [16]
 Section 10 was the outgrowth of intensive investigation by the Interstate Commerce Commission which brought to light the fact that a number of railroads had been swindled of vast sums in private deals with their own officials because of the fertile opportunities for uninhibited partiality in such transactions. Financial Investigation of New York, N. H. & H. R. R., 31 I.C.C. 32 (1914); Five Per Cent Case, 31 I.C.C. 351, 413-14 (1914). The tenor of the findings of the Investigating Committee of the Interstate Commerce Commission is reflected in the following passage contained in the report of "Financial Investigation of the New York, N. H. & H. R. R.," supra at p. 61:
 "Large purchases without bids.
 Purchases of cars and coal are two large expenditures that railroads make. The New Haven purchased cars almost exclusively from James B. Brady without competition and to the extent of some $37,000,000. Mr. Brady as a witness made no secret of his generosity to the officials with whom he had business. His methods were justified by him on the ground that the officers of the New Haven were old friends.
 Locomotives were purchased from a company in which a director of the New Haven was also a director. Many supplies obtained by the New Haven were from companies having directors who were also directors of the New Haven.
 Corporate economy is not practicable where gifts and obligations arising from friendship tend to obscure duty."
 
 
 [17]
 It will be remembered that at no time did plaintiff charge that Kaiser was party to any conspiracy prior to 1955
 
 
 [18]
 Even the addition of the proof respecting these two jobs adds nothing to plaintiff's charges of conspiracy. Plaintiff was formally awarded the subcontract for the Freeway job on November 25, 1952. The structure required both wide flange and plate, principally the latter. Plaintiff's source of supply for plate was ordinarily U. S. Steel and Kaiser, but when it experienced difficulty in securing material it also turned to Bethlehem Pacific. Prior to that time plaintiff's largest annual purchase of plate from Bethlehem Pacific had been 70 tons in 1950; its average annual purchase for the eight preceding years had been 36 1/8 tons; yet during 1953 Bethlehem Pacific sold plaintiff 2937 tons of steel, which exceeded by 821 tons the amount purchased from Kaiser whom plaintiff stipulated "met the requirements of * * * [plaintiff] as * * * [plaintiff] called on them to do so, in quantity, in time, and also was a good, adequate and prompt supplier" continuously until February 1, 1955
 The Teaching Hospital job of the Moore Dry Dock Company extended over the years 1950, 1951 and 1952. Plaintiff's evidence involved only the defendant Bethlehem Pacific's alleged discriminatory withholding of wide flange. But here too the evidence runs counter to the charge. Before Moore bid the job Bethlehem Pacific had indicated a willingness to supply Moore with needed material. But immediately after Moore was awarded the contract on July 10, 1950 the Korean War broke out, bringing with it a shortage followed by governmental restrictions. Moore was not only unable to secure priorities but the National Production Authority cut back the availability of steel for hospitals and some other types of buildings. Nevertheless in each year that Moore was engaged in that construction Bethlehem Pacific's deliveries to Moore on the average were three times greater than in any of the preceding four years when there was no shortage. We fail to understand how the mere fact that Bethlehem Pacific was itself able to construct the frame for a building before Moore could complete its job would tend to support a charge of a Sherman Act violation; and when this fact is placed in proper perspective it is clear that no such inference can arise: Bethlehem bid and was awarded its job after the onset of the war and in the light of the government restriction; the job was smaller than Moore's, and Bethlehem Pacific, like Moore, was also late in completing the work.
 
 
 [19]
 These documents do not appear in the printed record. By virtue of our Rule 17 (6) plaintiff was required to designate (and cause to be printed) "all of the record which is material to the consideration of the appeal" and we would be fully justified in disregarding this assignment of error. Sampsell v. Anches, 108 F.2d 945 (9th Cir. 1939). However, we decided not to invoke the extreme penalty and did ferret out the two documents, even though they required us to spend a considerable amount of time rummaging through a great mass of unsorted and loose documents. Our indulgence in this case should not be regarded as a forecast for other cases. Apparently the particular passage in the minutes which plaintiff desired to get before the jury was to the effect that the steel industry had adopted a voluntary alleviation system; a similar statement also appeared in the Report
 
 
 [20]
 28 U.S.C. § 1733 (1958). "Government records and papers; copies
 "(a) Books or records of account or minutes of proceedings of any department or agency of the United States shall be admissible to prove the act, transaction or occurrence as a memorandum of which the same were made or kept.
 "(b) Properly authenticated copies * * * shall be admitted in evidence equally with the originals thereof."
 
 
 [21]
 Plaintiff points to specific administrative authorization for the taking of minutes contained in War Production Board, General Administration Order No. 2-141, which was adopted by the Civilian Production Administration on November 5, 1945 and reads in part as follows:
 "Rules applicable to meetings with groups of industry representatives.
 * * * * *
 "Section 4. Procedure for Establishing and Using Industry Advisory Committee
 * * * * *
 ".03 Meetings of Industry Advisory Committees.
 "6. Presiding Officer's Agenda.
 "Minutes. The government presiding officer shall preside over all meetings of a committee. He shall cover each topic on the agenda of the meeting * * * and shall be responsible for the keeping of minutes of each meeting. Minutes may be a summary of important matters discussed at the meeting and need not be a full stenographic record * * *" Defendants appear to be critical of the purported minutes because they are "simply a summary." The point may be well taken because here the content is replete with conclusions and is very "sketchy." This may be because, as the Administrator explained, the practice was for chairmen to have "a recording secretary who was generally a stenographer, taking not verbatim records but notes of the general tenor of the discussion."
 
 
 [22]
 We italicize the adverb "apparently" to emphasize our extreme difficulty in determining what plaintiff's evidence would have been. Although in plaintiff's brief counsel refers to "offers of proof" the record references are to mere arguments to the court and long colloquies during the course of which plaintiff's counsel did make some factual statements; but it is impossible to ascertain from them with any degree of certainty what evidence plaintiff would have attempted to adduce. The so-called offers fall far short of the requirements that they "be offers of relevant proof, specific, [and] not so broad as to embrace irrelevant and immaterial matter * * *" [Central Pac. R. R. v. California, 162 U.S. 91, 16 S.Ct. 766, 40 L.Ed. 903 (1896)]; indeed it is doubtful that the trial court understood them as offers at all for it repeatedly urged plaintiff to make offers of proof
 Following appeal plaintiff made a motion in this court to supplement the record by adding some 31 pages of its Trial Brief which it is asserted was in fact tendered to the trial as an offer of proof. The motion was taken under advisement and is now denied. The transcript clearly shows that counsel are mistaken in their belief that the material was made the subject of any such offer.
 
 
 [23]
 For example, at one pre-trial conference plaintiff's counsel, in arguing the relevancy of past complaint proof asserted: "We merely ask to bring our damages up to date on those overt acts [alleged in the complaint]. They say some of them are two years [out of time]. That again is a masterly attempt to confuse the court. We complained about the car frame job — the whole series of such jobs. We were denied the right to bid on them, to do business with respect to them. They extend over a two-year period, but they are simply an accumulation of damages because of the fact that we can't do business in that field." On another such occasion counsel reiterated "On that [the Southern Pacific car frame jobs] it is our contention, as set forth in one of our pre-trial memoranda, that we were knocked out of the car frame business effectively in the year 1955, and hence those bids 157 to 164, which extended into the year 1956 and I believe possibly into 1957, were included in the damage period."
 During trial, when objection was made to such proof, plaintiff's counsel in opposition advised the court variously that "It bears on damage, your Honor," and "Now, my thought on this would be, it would be admissible to prove damages * * *."
 Plaintiff's erroneous opinion that each of a series of refusals to sell it steel constituted merely a part of a single claim rather than a separate claim may have been induced by plaintiff's practice of relating a number of orders to a particular job. The defendants, however, including U. S. Steel, did not deal with plaintiff on a job to job basis, nor concern themselves with plaintiff's intended use for any particular steel.
 
 
 [24]
 More than a year prior to this conference plaintiff had stipulated that its claims would be based upon defendants' conspiratorial conduct with reference to their supplying of structural steel for 42 specific jobs. It appears, as already stated, that structural steel is in a sense custom made — that is, produced only on order and that orders must be booked on the mills' rolling schedules for future production and delivery. It also appears that when this suit was commenced in November, 1955 some of the designated jobs had just recently been awarded to plaintiff and it had not then ordered material for them, others had only been commenced and little steel had been ordered or was then needed and yet others, although farther advanced, were far from completed and would require steel in addition to what plaintiff had received. In such a situation the advisability of a supplemental complaint seems only obvious
 
 
 [25]
 Typical is the statement in Department of Highways v. McWilliams Dredging Co., 10 F.R.D. 107 (W.D.La.1950), aff'd, 187 F.2d 61 (5th Cir. 1951) that "[t]here is no provision in the Federal Rules or statutes for the allowance to litigants of the costs of copies of transcripts of testimony which they see fit to purchase from the reporter, other than the original filed in the record." Accord, Kenyon v. Automatic Instrument Co., 10 F.R.D. 248 (W. D.Mich.1950), affirmed, 186 F.2d 752 (6th Cir. 1951), cert. denied, 342 U.S. 820, 72 S.Ct. 37, 96 L.Ed. 620
 
 
 [26]
 Rule 80(a) of the Federal Rules of Civil Procedure superseded Equity Rule 50, discussed in the Stallo case. Both rules authorized the court to appoint a stenographer to transcribe and report the proceedings and, within its discretion, to tax his fee as costs; but while the earlier rule was construed to relate only to the original transcript, there was some judicial authority that Rule 80(a) applied also to the copy of a transcript obtained by a party. See 6 Moore, Federal Practice, ¶ 54.77 [7], at 1372 (2d ed. 1953). Rule 80(a) was abrogated because of the intervention of the Court Reporter Act of 1944 (58 Stat. 5), which evidenced Congressional authorization for the allowance in the statements that the reporter might exact a fee "from parties * * * who request transcripts" and "any part or all of the fees for transcripts may be taxed as costs in the case." When the Court Reporter Act was carried over into the Judicial Code [28 U.S.C. § 753 (1958), as amended, 28 U.S.C. § 753 (Supp. IV, 1959-62)], the last quoted statement was dropped. However, its substance now appears in section 1920(2) as follows: "A judge or clerk of any court of the United States may tax as costs the following: * * * (2) Fees of the court reporter for all or any part of the stenographic transcript necessarily obtained for use in the case * * *." 62 Stat. 955 (1948), 28 U.S.C. § 1920 (1958). See generally A.B.C. Packard, Inc. v. General Motors Corp., 275 F.2d 63 (9th Cir. 1960). We think that this language, like that of the Court Reporter Act, evidences an intent to enlarge the enumeration and to include within the items of cost the expenses of copies of transcripts of pre-trial as well as trial proceedings. See Perlman v. Feldmann, 116 F.Supp. 102 (D.Conn.1953)
 
 
 [27]
 See note 26 supra
 
 
 [28]
 True, some courts, including the one in which this case was tried, have on occasion declined to exercise their discretionary power to tax the expense of a copy, reasoning that where the original was on file it was readily available for counsel's inspection and thus the copy served principally as a convenience. Burnham Chemical Co. v. Borax Consol., Ltd., 7 F.R.D. 341 (N.D.Cal.1947); Perlman v. Feldmann, supra. Here the vast number and size of the depositions — there were some seventy-four running well over 15,000 pages in length — effectively rendered them unavailable for practical purposes and dictated the necessity for copies. See Ryan v. Arabian American Oil Co., 18 F.R.D. 206 (D.C.N.Y.1955)