**UNITED STATES of America, Plaintiff,**

v.

**CHICAGO TRIBUNE–NEW YORK NEWS SYNDICATE, INCORPORATED, Defendant.**

**No. 67 Civ. 4596.**

United States District Court, S. D. New York.

March 9, 1970.

Gerald A. Connell, Hugh P. Morrison, Attys., Dept. of Justice, Washington, D. C., Norman H. Seidler, Atty., Dept. of Justice, New York City, for plaintiff.

Kirkland, Ellis, Hodson, Chaffetz & Masters, Chicago, Ill., Townley, Updike, Carter & Rodgers, New York City, for defendant; Hammond E. Chaffetz, William R. Jentes, Chicago, Ill., Ronald S. Daniels, John D. Canoni, New York City, of counsel.

WYATT, District Judge.

This is a motion by defendant Chicago Tribune-New York News Syndicate, Inc. (Tribune), a Delaware corporation, to dismiss the action because the complaint fails to state a claim upon which relief may be granted. Fed.R.Civ.P. 12(b) (6). For the reasons given hereafter, I feel obliged to deny the motion.

The complaint charges a violation by Tribune of Section 1 of the Sherman Act (15 U.S.C. § 1). The government as plaintiff asks for a declaratory judgment and an injunction (15 U.S.C. § 4).

The following state of affairs is shown by the complaint.

A "feature" is a literary or artistic creation prepared for publication in newspapers. Comic strips are features; crossword puzzles are features; gossip columns are features; columns of information and opinion (such as those written by Walter Lippmann) are features.

Tribune is a "feature syndicate". It obtains many features from authors and artists, then by mechanical means reproduces the features, and then distributes the features to a "substantial number" of the some 1700 newspapers in the United States. While the complaint does not so state, the parties are agreed that the features are copyrighted and for purposes of this motion Tribune is to be regarded as owner of the copyright.

Tribune makes agreements with the newspapers under which for a price Tribune supplies features and licenses the newspapers to publish them. As part of such agreements, Tribune specifies an exclusive territory within which Tribune will not furnish the features to any other newspaper.

The features are important to the newspapers; popular features are much sought for by the newspapers, which regularly evaluate the popularity of features and try to secure additions and substitutions. Inability to secure popular features limits a newspaper's capacity to provide its readers with a well-rounded service.

The complaint charges that Tribune is unreasonably restraining interstate trade and commerce in that in its contracts with newspapers it "agrees not to license the features to any other newspaper published *within an arbitrary and unreasonably broad territory* surrounding the contracting newspaper's city of publication" (emphasis supplied). The complaint also avers that when Tribune negotiates agreements with newspapers, fixing the price of a feature sometimes involves "the extent of an exclusive territory within which the Syndicate agrees not to offer or distribute the feature to other newspapers".

It is said that these exclusive territorial licenses have the effect of depriving many newspapers arbitrarily of certain features and of denying many readers access to certain features.

The motion is addressed solely to the complaint and raises no question as to the merits. Whether the government can prove its averments is not a matter for present inquiry. Nothing in this opinion is intended to express any view as to the issues of fact.

■ The substance of the complaint is that Tribune makes agreements with its newspaper customers to supply them with features, that Tribune agrees that it will not sell such features to other newspapers within a specified territory, that the specified territory is "arbitrary and unreasonably broad", and that the agreements between Tribune and its customers are thus "in unreasonable restraint" of interstate trade and commerce.

The point made for Tribune is that by reason of the *copyright*, an exclusive territorial license may be granted, no matter how "arbitrary" or how "unreasonably broad" the territory may be; moreover, that even without a copyright "exclusive territorial licenses * * * have long been considered lawful under the antitrust laws *regardless of the area involved*" (memorandum for movant, p. 2; emphasis supplied).

It is assumed for purposes of this decision that as a matter of copyright law a license may be made exclusive within a specified territory. This proposition, however, is by no means so firmly established as movant contends. In the patent law, there is a specific provision for conveyance of an exclusive right "to the whole or any specified part of the United States" (35 U.S.C. § 261). There is

no similar provision in the Copyright Act. The decisions cited for movant are from many years ago. One of the best discussions of the problem is found in Milgrim, Territoriality of Copyright, etc., 12 ASCAP Copyright Law Symposium 1, 13–14 (1963).

That copyright law permits a geographically exclusive license is not an answer to the question raised by the present motion. The geographically exclusive license still remains subject to the antitrust laws; the copyright monopoly provides no blanket exemption. Such seems to be a principle laid down in Interstate Circuit v. United States, 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610 (1939). This decision is not discussed by counsel for Tribune but its examination in some detail is rewarding.

The defendants were eight distributors of copyrighted motion picture films and two first run exhibitors (here called collectively "Interstate") of the films in their movie theaters. Interstate demanded that the distributors agree to place two restrictions on second run licenses of the copyrighted films. The restrictions were calculated to improve the competitive position of Interstate (as a first run licensee) in respect of the second run licensees. Each distributor agreed to the two restrictions which, while not geographical, seem to have been in principle the same as the geographical restriction found here. Each distributor was in the position of Tribune; Interstate was in the position of the newspapers; and the copyrighted films had the same place as the copyrighted features here.

The government brought the same type of civil action as that at bar. The District Court decided in favor of the government.

In the Supreme Court, defendants argued: (1) that there was no evidence of conspiracy among the distributors, (2) that agreements between a distributor and an exhibitor "are within the protection of the Copyright Act and consequently are not violations of the Sherman Act" (306 U.S. at 220–221, 59 S.Ct. at 472), and (3) that the two restrictions were not unreasonable.

The Supreme Court found the evidence sufficient to show an agreement among the distributors.

Counsel for Tribune would undoubtedly contend that this was a significant difference from the case at bar, where no conspiracy or agreement between Tribune and other feature syndicates is claimed.

The argument to the Supreme Court, however, was in these words:

"A distributor, the owner of a copyrighted motion picture photoplay, *acting independently of any other distributor,* has the legal right to agree with a first run exhibitor to include either or both of the restrictions here in question in subsequent run license agreements.

\* \* \* \* \* \*

"The protection given by the law to the copyright owner is still greater. Apart from agreements to impose restraints unrelated to the reward of the statutory monopoly, or to monopolize trade in articles not covered by the statutory monopoly, a copyright proprietor in granting an exhibition right may bind and restrain himself by any covenant which has *reasonable* relation to the reward of the copyright or the protection of the granted right even though such covenants directly restrain interstate commerce." (306 U.S. at 209–210, 211–212, 59 S. Ct. at 467; emphasis supplied.)

It may be noted that this argument to the Supreme Court is by no means so broad as that made for Tribune here. Tribune contends that under the copyright monopoly it can agree to any restriction whatever, whether or not it has a *"reasonable* relation to the reward of the copyright or the protection of the granted right" (emphasis supplied).

The Supreme Court dealt with the argument in *Interstate* just as it was

made (306 U.S. at 227, 59 S.Ct. at 475; emphasis supplied):

"Appellants assail this part of the decree on the ground that such separate agreements, *if entered into without agreement or concert among the distributors*, are a legitimate exercise of the monopoly secured to the distributors by their copyrights."

The Supreme Court concluded that, even in the absence of any conspiracy or agreement among the distributors, a contract for the two restrictions made between a distributor copyright owner and Interstate was subject to the antitrust laws. The Court said (306 U.S. at 228, 229–230, 59 S.Ct. at 475–476):

"The restrictions imposed upon Interstate's competitors did not have their origin in the voluntary act of the distributors or any of them. They gave effect to the will and were subject to the control of Interstate, not by virtue of any copyright of Interstate, for it had none, but through its contract with each distributor.

" * * * The fact that the restrictions may have been of a kind which a distributor could voluntarily have imposed, but did not, does not alter the character of the contract as a calculated restraint upon the distribution and use of copyrighted films moving in interstate commerce. Even if it be assumed that the benefit to the distributor from the restrictions is one which it might have secured through its monopoly control of the copyright alone, that would not extend the protection of the copyright to the contract with Interstate and to the resulting restraint upon the competition of its business rivals.

"A contract between a copyright owner and one who has no copyright, restraining the competitive distribution of the copyrighted articles in the open market in order to protect the latter from the competition, can no more be valid than a like agreement between two copyright owners or patentees. * * * In either case if the

contract is effective, as it was here, competition is suppressed and the possibility of its resumption precluded by force of the contract. An agreement illegal because it suppresses competition is not any less so because the competitive article is copyrighted. The fact that the restraint is made easier or more effective by making the copyright subservient to the contract does not relieve it of illegality."

Three justices dissented on the ground that the two restrictions "were not *unreasonable* restraints of commerce under the Sherman Act" (306 U.S. at 237, 59 S.Ct. at 479; emphasis supplied). The dissenting opinion (by Mr. Justice Roberts) did not suggest that the copyright monopoly carried an exemption from the antitrust laws. Mr. Justice Roberts said (306 U.S. at 235, 59 S.Ct. at 478): "I agree that while the Copyright Act gives a distributor a so-called monopoly, that monopoly cannot be made the cover for a conspiracy to restrain trade or commerce".

As to this sentence at least, the Court was unanimous. Applied to the case at bar, this means that the government should be allowed at trial to present evidence to show that the agreements between Tribune and the newspapers as to their geographical restrictions amounted to unreasonable restraints of trade or commerce.

Mr. Justice Roberts further explained the position under the antitrust laws of restrictions in copyright licenses (306 U.S. at 236–237, 239, 59 S.Ct. at 478–480; emphasis supplied):

"All the Copyright Act does is to create a form of property in the literary or artistic production of the author or artist. The Act attaches to the product of his brain certain attributes of property. One of these is the right of exclusive use similar to that attaching to physical property; another is the right to sell the production with consequent exclusive enjoyment in the vendee; another is the right to license others to use the product as one might lease or bail real or personal property.

The monopoly, so called, amounts to no more than the attachment to the work of an author or composer or producer of motion pictures the same rights as inhere in other property under the common law. Therefore, the standing of the distributor defendants toward their customers, as respects the productions proposed to be licensed, differs in no way from that of the owner of any other property toward those to whom he leases or licenses its use or sale.

"The decision of the court necessarily means that the owner of a product may not agree with an important customer that the former will not sell the product at a cut rate to the latter's competitors in the same city in which he conducts his business. The decision leads to the necessary conclusion that a manufacturer whose skill results in the production of apparatus of superior quality may not, in consideration of a price to be paid him for the bailment of that apparatus to certain users in a city, contract, as an inducement to the users, that he will not bail the same apparatus at lower and destructive prices to his bailees' competitors in the same city. I think it has never been suggested that an agreement of the sort mentioned, *restricted in time and place*, amounts to a conspiracy in unreasonable restraint of trade or commerce.

\*　\*　\*　\*　\*　\*

"Once the property rights conferred by the Copyright Law are recognized it must follow that the principles governing the right to use, sell, or turn to account other forms of property are equally applicable here. We have often held that a contract containing a covenant in restraint of trade is valid if the restraint is *reasonably* necessary for the protection of the right granted by the owner of the property. Examples of such lawful contracts are those by which the vendor of a business sold as a going concern agrees that for the protection of its value he will for a period of years refrain from engaging in the same business in a prescribed territory; and those by the vendor with the vendee of an article to be used in business or trade that it shall not be used so as to interfere with the vendor's business; which are held not to offend the Sherman Act if the prohibition has a *reasonable* relation to the value of the business of the vendor."

The same principle appears to have been followed in United States v. Paramount Pictures, Inc., 66 F.Supp. 323, 70 F.Supp. 53 (S.D.N.Y.1946), aff'd in part, rev'd in part on other grounds and remanded, 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260 (1948), on remand, 85 F. Supp. 881 (S.D.N.Y.1949), aff'd per curiam, 339 U.S. 974, 70 S.Ct. 1032, 94 L.Ed. 1380 (1950).

The *Paramount* litigation first came before a three judge district court (15 U.S.C. § 28). It involved copyrighted motion picture films and was a civil action similar to that at bar. The court, among other things, dealt with a "clearance" provision, that is, a provision in the license of a copyrighted film that the copyright owner would not grant any other license within a specified area for a specified period. The object of clearance is to protect the first licensee. The analogy to the geographical restrictions here seems close. The court first considered the problem as one where an individual distributor and an individual exhibitor agreed on clearance, that is, as one where there was no conspiracy or agreement between distributors. The government argued that any clearance agreement was per se a violation of the Sherman Act. The district court rejected the argument, saying (by Judge A. N. Hand) that "a grant of a clearance, when not accompanied by a fixing of minimum prices or not *unduly* extended as to area or duration, affords a fair protection to the interests of the licensee without unreasonably interfering with the interests of the public" (66 F.Supp. at 341; emphasis supplied). The court reasoned from the rule at common law that a contract provision in restraint of

trade was not void if merely ancillary to the main purpose of the contract and reasonable to the protection of that purpose. The court said (66 F.Supp. at 341; emphasis supplied):

"At common law a vendor of income-producing property may validly covenant with his purchaser not to compete for a given time or within a given area so long as the restrictions are reasonably necessary to protect the value of the property purchased. * * * It is true that licenses of property rather than sales are here concerned and that the distributors covenant not only not to exhibit the films themselves, but also not to license them to others. Nevertheless, we believe these are not differences which affect the applicability of the common-law rule to the present case, for licenses between one distributor and one exhibitor with *reasonable* clearance provisions do not, in our opinion, involve anything unlawful."

The district court enumerated seven factors to be considered in determining whether a clearance was "unreasonable". One of these was: "There should be no clearance between theatres not in substantial competition".

Applying this factor to the case at bar, the government would be permitted to argue at trial that the geographical restriction in a license to X newspaper was too broad because it extended to an area in which no newspaper was in substantial competition with X newspaper.

In *Paramount,* the district court went on to find that there was a conspiracy among the defendants to impose unreasonable clearances.

The Supreme Court approved the treatment of clearances by the District Court. The opinion refers in detail to the seven factors listed by the District Court. The opinion refers to the finding that "many clearances had no relation to the competitive factors which alone could justify them" and that clearances "were made applicable to situations without regard to the special circumstances which are necessary to sustain them as reasonable restraints of trade" (334 U.S. at 146, 68 S.Ct. at 924). This language is that of ancillary restraints at common law and does not appear to be limited to cases where a conspiracy of copyright owners is established.

The Supreme Court did reject a suggestion by appellants that they as licensors should be allowed "in granting clearances to take into consideration what is reasonably necessary for a fair return to the licensor" (334 U.S. at 147, 68 S.Ct. at 924). This was because of the "proclivity" of appellants "to unlawful conduct" (334 U.S. at 147, 68 S.Ct. 915) which required that "the only measure of reasonableness of a clearance by Sherman Act standards is the special needs of the licensee for the competitive advantages it affords" (334 U.S. at 148, 68 S.Ct. at 924). The Supreme Court went on to say: "Whether the same restrictions would be applicable to a producer who had not been a party to such a conspiracy is a question we do not reach" (334 U.S. at 148, 68 S.Ct. at 924). This certainly cannot mean that *any* clearance by such a producer would be exempt from Sherman Act standards. The opinion as a whole seems clearly to say that if a clearance in a copyright license is not reasonable as an ancillary restraint, it is in violation of the Sherman Act.

Counsel for Tribune cite Theatre Enterprises, Inc. v. Paramount, etc., 346 U.S. 537, 74 S.Ct. 257, 98 L.Ed. 273 (1954). This was a private treble damage case which went to trial, after which the jury returned a verdict for defendants. It involved a claim that the several motion picture producers and distributors violated the antitrust laws by conspiring to refuse plaintiff a first run license. The Supreme Court affirmed the judgment for defendants. Counsel contend that "the Court left no doubt that since no conspiracy had been proved, the defendants clearly had the right to grant exclusive territorial licenses to whomever and within whatever area their inde-

pendent business judgment indicated would maximize their revenues" (memorandum p. 12). There seems not the slightest justification for the contention. The very first sentence of the Supreme Court opinion states the claim of plaintiff as one of conspiracy to restrict first run licenses to downtown Baltimore theaters, thus confining plaintiff at its suburban theatre "to subsequent runs and *unreasonable* 'clearances' " (346 U.S. at 538, 74 S.Ct. at 258; emphasis supplied). The Supreme Court found that there was not enough evidence of conspiracy to require the trial court to direct a verdict for plaintiff. Certainly nothing in the opinion even intimates that, absent a conspiracy, any clearance would be reasonable; indeed, if anything, there is every indication to the contrary because the Court discussed, in ancillary restraint terms, the evidence of the reasons why clearance over plaintiff was given to the downtown theaters.

The conclusion is that the copyright monopoly does not justify or require the granting of this motion.

It is contended for Tribune that even when the articles of commerce are not copyrighted it is lawful under the antitrust laws to grant exclusive territorial licenses "regardless of the area involved" (memorandum for movant, p. 2). This contention is broadly stated and undoubtedly is correct in some circumstances; it is too broad to exempt the situation stated in the complaint at bar.

The situation here is not like United States v. Arnold, Schwinn & Co., 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967) on which Tribune relies. The language of *Schwinn* is that "a manufacturer of a product other and equivalent brands of which are readily available in the market may select his customers, and for this purpose he may 'franchise' certain dealers to whom, alone, he will sell his goods" (388 U.S. at 376, 87 S.Ct. at 1864).

The government may be able to show at trial that there are no products available in the market which are "equivalent" to the features of Tribune. This

seems to be the fair intendment of the averments of the complaint and the additional agreed fact that the features are copyrighted gives support to this view.

The government may also be able to show at trial that the agreements between Tribune and the newspapers were not examples of the "right" of Tribune "freely to exercise [its] own independent discretion as to parties with whom [it] will deal". United States v. Colgate & Co., 250 U.S. 300, 307, 39 S.Ct. 465, 468, 63 L.Ed. 992 (1919). The government may be able to show that the agreements on the exclusive territorial area were not in the exercise of "independent discretion" by Tribune but were influenced or dictated by the newspapers, concerned with their own position. If so, the reasoning of *Schwinn* and *Colgate* would not be applicable.

■ Many other cases involving exclusive territorial franchises to dealers are cited for Tribune. These have been considered. They do not establish any rule that such grants comply with the antitrust laws, regardless of the circumstances. What they do establish is a rule that an exclusive dealership is valid under the antitrust laws even though it restrains trade, provided the restraint is not unreasonable. The restraint is not unreasonable where, as well said by Judge Frank in Bascom Launder Corp. v. Telecoin Corp., 204 F.2d 331, 335 (2d Cir.), cert. denied 345 U.S. 994, 73 S.Ct. 1133, 97 L.Ed. 1401 (1953), the exclusive franchise was "(a) ancillary to a reasonable main purpose—a source of supply to the distributor—and (b) fairly protective of that distributor's interests but not so large as to interfere with the interests of the public".

In another decision on which Tribune relies, it is said:

"It is essential, therefore, that the complaint allege facts from which it can be determined that the conduct charged to be in violation of the antitrust laws was reasonably calculated to prejudice the public interest by *un-*

**1308**

*duly* restricting the free flow of interstate commerce". Schwing Motor Co. v. Hudson Sales Corp., 138 F.Supp. 899, 903 (D.Md.; emphasis supplied), affirmed on opinion below 239 F.2d 176 (4th Cir. 1956), cert. denied, 355 U.S. 823, 2 L.Ed.2d 38 (1957).

The averment in the complaint here is that the territory within which Tribune agreed that it would not sell its features to other newspapers was "arbitrary and unreasonably broad". The government ought to be allowed to show at trial, if it can, that the exclusive territories granted to contracting newspapers are greater than needed to protect such newspapers in their use of the purchased features. If so (and this is a question of fact) the contracts may be found in violation of Section 1 of the Sherman Act. Certainly the action ought not to be dismissed as a matter of law; the complaint does state a claim.

The government does not aver that *competition* between newspapers was unreasonably restrained, but this is no defect in its claim. The government apparently concedes that Tribune may select its customers and may protect them within a reasonable territory in the exploitation of the purchased features, even if this does restrain competition. What the government contends is that Tribune agrees to an exclusive territory which is "arbitrary and unreasonably broad" because *not* needed to protect the newspaper customer in the exploitation of the purchased features. It is unreasonable restraint of "trade or commerce" at which the Sherman Act is directed. The public interest is prejudiced if a part of the reading public is denied access to the features of Tribune because of a contract which has no real justification. If the government can establish this at trial, an unreasonable restraint of trade in violation of the Sherman Act may be found; if the government fails, the action will then be dismissed on the merits.

The motion is denied.

So ordered.