ROMAC RESOURCES, INC., and Modern Home Institute, Inc.

v.

HARTFORD ACCIDENT AND INDEMNITY COMPANY et al.

Civ. Nos. 11386, 11464.

United States District Court, D. Connecticut.

June 18, 1974.

Leonard A. Schine, Joel C. Karp, Robert L. Julianelle, Thomas C. Gerety, Ronald Bozelko, J. Daniel Sagarin, Bridgeport, Conn., for plaintiffs.

Ralph C. Dixon, Richard M. Reynolds, Hartford, Conn., David Goldstein, Bridgeport, Conn., George D. Brodigan, Hartford, Conn., William Piel, Jr., New York City, J. Read Murphy, Robert E. Cohn, George Levine, John J. Kenny, Hartford, Conn., John L. Warden, New York City, for defendants.

## RULING ON MOTIONS FOR SUMMARY JUDGMENT

BLUMENFELD, District Judge.

This is an action for treble damages by two related plaintiffs against several Hartford-based casualty insurance companies charging them with Sherman Act violations predicated on an alleged group boycott.

The action was begun by Romac Resources, Inc. (No. 11,386) on April 15, 1966. Seven weeks later another action was brought by Modern Home Institute, Inc. (No. 11,464), the parent of Romac. Both complaints named the same defendants, and, since their allegations were identical, the two cases were consolidated on June 29, 1966. The case has a long history, not unusual in cases of this nature. When it reached its present stage, which calls for rulings on the several defendants' motions for summary judgment, the judge before whom it had been pending and the parties agreed that the case should be transferred to me and that I might decide the pending motions on the papers and briefs without the benefit of oral argument.

The gist of the complaint in both cases is that twelve insurance companies, Hartford Accident and Indemnity Company and Hartford Fire Insurance Company ("The Hartford"), The Aetna Casualty and Surety Co. ("The Aetna"), The Travelers Insurance Company and The Travelers Indemnity Co. ("The Travelers"), Allstate Insurance Company, Nationwide Mutual Insurance Company and Nationwide Mutual Fire Insurance Company, Liberty Mutual Insurance Company and Liberty Mutual Fire Insurance Company, State Farm Mutual Insurance Company and State Farm Fire and Casualty Company, and The Connecticut Association of Independent

Insurance Agents, Inc. ("CAIA"), contracted, contrived and conspired with each other in refusing to purchase from the plaintiffs a list of the names of holders of automobile insurance policies with the dates on which their policies expired ("X-dates").

Five years later, in 1971, the plaintiffs filed an Amended Substituted Consolidated Complaint. This added allegations as to separate conspiracies among the direct writers, among the agency companies, among the agency companies and their individual agents, and among the agency companies and CAIA. Plaintiffs also interjected into the pleadings the theory that the defendants were liable under the doctrine of conscious parallelism. At the second pre-trial conference on September 28, 1972, the plaintiffs advised the Court that they had decided to dismiss the action against the "direct writers" of insurance since under the plaintiffs' theory of the case only those "agency" companies dealing with independent agents were involved in the alleged conspiracy. Stipulations were subsequently filed dismissing all of the direct writer defendants. The remaining defendants are The Hartford, The Travelers, The Aetna, and CAIA. The litigation to date has consumed seven years, reflected by roughly 150 pleadings, numerous exhibits, affidavits, and approximately 5,000 pages of deposition testimony.

## I.

### A.  *Nature of Plaintiffs' Business*

Modern Home Institute, Inc. is a New York corporation; its wholly owned subsidiary, Romac Resources, Inc., was organized in New York in 1962 with a capitalization of approximately $500, to act as an agent for the sale of X-dates. From 1958 until 1962 Modern Home was engaged in the business of gathering information known as "family profiles" and selling this information to various merchants. For example, an individual would be contacted by telephone and requested to give such information as his name, address, number of children, the number of automobiles and appliances his family owned, and other similar information. The data so compiled was sold to retail merchants at ten cents per name.

In September 1960, Modern Home established an office in Cleveland, Ohio in furtherance of its family profile business, and Mr. Robert D'Arpa, who is the Secretary and a director of the corporation, was placed in charge of the operation. Mr. D'Arpa leased an office and obtained personnel on a part-time basis to gather necessary information by telephone. Mr. D'Arpa ran this office for only seven months, until April of 1961.

It was during this seven-month period of time that the idea of acquiring lists of X-dates of automobile insurance policies and selling such lists to insurance companies was explored. An agent from Nationwide Insurance Company in Cleveland approached Mr. D'Arpa and asked if Modern Home could acquire expiration dates for automobile insurance policies. It was by virtue of this chance request that Modern Home first entered into the business of acquiring and selling expiration dates. Modern Home furnished the Nationwide agent with some expiration dates, but shortly thereafter it was forced to close its Cleveland office and abandon its family profile business. Mr. D'Arpa thereupon returned to New York to concentrate on soliciting and selling expiration dates.

A year went by and then, between May and August of 1962, the plaintiffs sought to market lists of expiration dates by attempting to sell them to, *inter alia*, the insurance companies who remain as named defendants in this case. The business did not go very well. Romac had taxable income of only $515.46 in 1962, and never engaged in business after that year.

### B.  *Plaintiffs' Approaches to Defendants*

In 1962, the plaintiffs approached several insurance companies in an attempt to sell the X-dates. They would sell a

very limited number of X-dates on a trial basis, and if the purchaser contracted for their product, they would thereafter seek to recruit personnel and obtain a larger quantity of X-dates: their thought was that they would sell the same list of X-dates to two—and only two—insurance companies. One would be a "direct writer," such as Allstate, Nationwide or State Farm, and the other would be a "stock" or "agency" company, such as The Hartford, The Travelers, or The Aetna.[1] The sale price would be 45 cents a name to each of the two companies, so that the plaintiffs would realize 90 cents a name. It was stipulated by the plaintiffs that the purchasing companies would have to take the entire output of X-dates generated by the plaintiffs. Mr. D'Arpa testified that the plaintiffs contacted "approximately 30" insurance companies.

Every one of the 30 insurance companies, without exception, rejected the plaintiffs' offer. The rejections took place in 1962, the year the offers were extended. More detailed information with respect to the circumstances under which the three insurance companies being sued rejected the plaintiffs' proposal was obtained during the course of pretrial proceedings.

1. *The Aetna Casualty and Surety Company*

The Aetna Casualty and Surety Company was first contacted by the plaintiffs on or about May 8, 1962. Mr. D'Arpa came to The Aetna's Home Office at Hartford and presented the plaintiffs' proposed plan to Mr. Ellis, Secretary at The Aetna, whose responsibility was mainly sales of private passenger automobile insurance. Mr.

D'Arpa proposed to sell private passenger automobile expiration dates to "one so-called direct writer, and the same list to one so-called stock agency company." He made it clear that he would not be in a position to contract to sell their X-dates until he talked to other companies since he wanted to sell to the one that could use the greatest number. A quantity of X-dates was offered on a trial basis and Mr. Ellis agreed to buy 100 for a trial test. Mr. D'Arpa asked about the automobile insurance business, how it was sold and marketed and so on. Mr. Ellis told him everything he wanted to know.

Mr. Ellis arranged for Mr. Healy, Manager of the Agency Department in The Aetna's Newark Branch Office, to conduct a trial test of X-dates. On or about May 12, 1962, Mr. Healy received 100 X-dates from Mr. D'Arpa and on May 14, 1962, Mr. Ellis received the invoice from Romac in the amount of $30 for 100 X-dates at 30 cents each.

The plaintiffs next contacted The Aetna in late June or early July 1962. At that meeting Mr. D'Arpa introduced Mr. Ellis to Mr. Max Wallach, the President, controlling stockholder and a director of Modern Home Institute, Inc. In response to inquiries by the plaintiffs, Mr. Ellis explained the relationship of an agency company to its agents and the standard provision of a stock agency company's agency agreement with its agents concerning expirations.[2] Shortly before this meeting the Connecticut State Insurance Commissioner had made a public statement against the sale of X-dates which was disturbing to Mr. Wallach and to Mr. D'Arpa.[3] This was discussed.

---

[1]. A direct writer sells through its salaried sales force, which promotes only the line of insurance sold by the employer. An agency company obtains insureds through placement of risks with it by independent agents, who are not employed by any insurance company, and who usually are able to, and do, place risks with more than one agency company.

[2]. This is discussed more fully at pp. 549–550, *infra*.

[3]. It was not feasible to buy or use X-dates in Connecticut because the Insurance Commissioner had stated that the sale of X-dates was contrary to the agency licensing laws of the state and that non-licensed persons who solicited X-dates would be prosecuted. *See* note 5 *infra*.

There was no discussion of a contract for X-dates because no contract was contemplated while the trial X-dates were being tested in Newark and while the plaintiffs were still investigating or considering the markets for their products. Neither at the initial interview on May 8, 1962, nor at this luncheon was any estimate given of numbers of X-dates the plaintiffs proposed to offer. There was a discussion of different geographical areas for which they could supply X-dates. Mr. Ellis ruled out Massachusetts because The Aetna was not selling its automobile liability policies there. Mr. Wallach and Mr. D'Arpa were vague about supplying X-dates on a national scale as they did not then have the organization but thought they could build one in places where they were then active.

On July 9, 1962, Mr. Healy submitted a preliminary report to Mr. Ellis on the trial test of X-dates in New Jersey. The amount of business developed was minimal.

On July 10, 1962, Mr. Ellis and Mr. Van Gils, Vice President of The Aetna, went to the office of the plaintiffs in Pelham, New York, and met with Mr. D'Arpa and Mr. Max Wallach. The purpose of the visit was to become acquainted with the plaintiffs' facilities and to find out exactly what would be expected of each party if The Aetna were to enter into some sort of agreement to buy X-dates. Some of The Aetna's problems were outlined including the fact that in order to avoid furnishing X-dates of one Aetna agent to another competing in the same area, see p. 548, *infra*, all X-dates would need to be cleared with The Aetna's records and branch office records, and that Massachusetts would have to be excluded. The number of X-dates that the plaintiffs proposed to sell came up for the first time. The plaintiffs expected to generate about 9,000,000 X-dates a year for several years. At 45 cents each the total cost would be in excess of $4,000,000 a year.

Mr. Ellis and Mr. Van Gils came away from the conference with the definite understanding that unless they took the total number of X-dates to be generated, amounting to 8,000,000 to 10,000,000 a year, they could not have any. On the trip home from Pelham they mutually arrived at a decision against the proposal. They discussed at some length the quantity involved, the feasibility of its use and the total expense of it. They discussed the possibility of agents' sharing a major part of the cost.

On July 16, 1962, it was announced at the weekly Aetna Agency Department Staff meeting that The Aetna had concluded that it would not purchase the X-dates offered by Romac Resources, Inc. The minutes of the Agency Department Staff meeting for July 16, 1962, contain the following:

"Mr. Ellis discussed the meeting that he and Mr. Van Gils had with Romac Resources, Inc. that they had on Tuesday, July 10. It has been concluded that we will not avail ourselves of their service of obtaining x date[s]. A memo to our Field Office setting forth a reason for not subscribing to this service will be sent in the future."

On July 17, 1962, Mr. Ellis mailed to Mr. D'Arpa a letter stating that The Aetna declined to accept Romac's offer.

### 2. *The Hartford Companies*

At the beginning of May 1962, during the same period when the plaintiffs were discussing their proposal at The Aetna, Mr. D'Arpa contacted Mr. Frank Cox of The Hartford, who referred him to Mr. Channing Barlow. On May 3, 1962, D'Arpa phoned Barlow, briefly described the proposal of Romac to sell expiration dates to The Hartford, and requested a meeting for the following week.

On May 8, 1962, at 2:00 P.M., in a meeting at The Hartford's offices, D'Arpa outlined his proposal to Barlow and his associates, Mr. John Gilmore and Mr. Kenneth Cagney. The basic proposal was that Romac and Modern

Home would supply, on an exclusive basis to only two insurance companies, lists of automobile insurance policyholders, their addresses and the dates of expiration of their respective policies. The lists were to be broken down by geographic areas and would be compiled from telephone interviews, as had been done in the Cleveland experiment.

Mr. Barlow's first and primary concern about the proposal made to The Hartford was about its quality—could certain depressed areas be eliminated, could D'Arpa actually put together a viable organization, and could the names of the issuers of the policies be supplied? At the end of their meeting Barlow told D'Arpa that, while he personally was interested, the proposal would require a considerable amount of thought and investigation; it presented some serious problems.

One problem was that Romac was not prepared to supply the name of the insurer along with the name of the policyholder, and thus The Hartford, if it purchased the lists, would be paying for the names of its own policyholders. Unless a great deal more work was done on the lists to sort out those names before they were sent out to agents, some of those solicited would be existing Hartford policyholders. Moreover, unless the names of both the policyholder's existing insurer and of his agent were known, The Hartford could not use the information without causing serious problems in its relations with agents. The independent agents with whom The Hartford deals are not its employees and many, if not most, of them deal with other insurers as well. In cities where The Hartford has more than one agent, it might well be supplying one agent with information about the customers of another agent.

Another problem was the high cost of the Romac proposal. On purely a test basis the names were to cost 30 cents each, and thereafter the price was to go up to 45 cents per name. In comparison The Hartford had been paying the Ruben H. Donnelly Company about two cents per name for lists of names and addresses of automobile owners by geographic area. Another shortcoming was that the Romac proposal was not being offered on a wholly exclusive basis.

All these problems were discussed among Messrs. Barlow, Gilmore and Cagney immediately after the meeting with D'Arpa on May 8, 1962. Because of the agency relations problems Gilmore immediately advised against utilizing the proposal, but in spite of these negative impressions the proposal was discussed with other officers at The Hartford, and it was not until late in May 1962 that a final decision was reached not to purchase the lists of names from Romac.

At the same time, Barlow realized that the difficulties that The Hartford would have in making use of the Romac proposal might not be experienced by other insurance companies. It was virtually certain that no agent relations problems would be experienced by a "direct writer" company, with its captive, employee sales force. In view of this, Barlow and his colleagues thought that The Hartford's agents should be alerted to the substance of the Romac proposal.

At a staff meeting on May 21, 1962, the decision was made not to buy the Romac proposal and to send a bulletin to all Hartford agents. On May 31, 1962, Mr. Barlow wrote Mr. Wallach of Romac and informed him that The Hartford had decided not to purchase the lists of names. The final draft of the letter to agents was prepared and released by June 6, 1962.

### 3. The Travelers

On April 18, 1962, two weeks before D'Arpa first contacted the Aetna representatives, Mr. John R. Coakley, the superintendent of agencies of The Travelers' casualty department, and Mr. Audrow Nash, who is now deceased, met with Mr. D'Arpa and Mr. Wallach concerning the sale of X-dates. The plaintiffs offered to provide The Travelers with lists of the expiration dates of automobile insurance policies on a geographical basis. Wallach and D'Arpa

were advised by Coakley and Nash that neither of the latter gentlemen had the authority to decide whether or not The Travelers would purchase such a product, but that the matter would be discussed with Mr. Virgil Roby, their immediate superior, who could make such a decision.

Coakley and Nash advised Roby of the proposal which had been submitted by the plaintiffs and Roby immediately rejected it. When deposed, Mr. Roby testified that upon hearing the proposal he stated, "I reject it. Absolutely." His reason for rejecting the plaintiffs' proposal was because it undermined the principles of the American Agency System.

By letter to Coakley dated May 15, 1962, Romac outlined the substance of the proposal which had previously been set forth orally at the meeting on April 18, 1962. Coakley immediately acknowledged receipt of that letter by telephone, and on May 18, 1962, wrote D'Arpa advising him that The Travelers would not purchase the plaintiffs' expiration dates "because of the Travelers' commitment to the independent system of agency representation (that is, the ownership of expiration by the agent himself) . . . ." Mr. Coakley added that The Travelers would consider the idea of offering the X-dates to its independent agents, to be purchased by them, "but at the present time the Travelers will not pay for this information itself." This was two weeks before The Hartford had rejected the proposal, and two months before The Aetna rejected it.[4]

Subsequently, on June 25, 1962, when it became known that X-dates were being offered by the plaintiffs to other insurance companies, Mr. Roby directed that a letter be sent by his managers to The Travelers' agents which stated that The Travelers would not purchase such lists because ownership of X-dates was the property of the agent. On July 5, 1962, The Travelers sent a letter to its own agents advising them that The Travelers had been offered lists of expiration dates for automobile insurance policies, but that the proposal had been rejected.

## II.

I turn next to consider the antitrust implications presented by the foregoing narrative of facts.

### A. *The Relevant Market*

Whenever an issue involving an alleged violation of the antitrust laws arises, an initial, and sometimes pivotal, point of the case depends upon a determination of what constitutes the "relevant market"—the line of commerce affected by the alleged conspiracy. While the relevant market is usually defined in terms of a product market and a geographical market, it has been taken for granted by the parties to this case that the relevant geographical market encompasses all 50 states of the Union. The Court accepts this assumption and will proceed to examine the relevant market solely in terms of the product in issue —automobile insurance expiration dates.

Initially it may be useful to consider the character of an X-date as a useful lead to a prospective buyer of an insurance policy, in the context of "trade or commerce" as used in § 1 of the Sherman Act, 15 U.S.C. § 1, making illegal "[e]very contract, combination in the form of a trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations." As distinguished from direct-writing insurance companies (such as those who were dropped as defendants in this case) who solicit insurance directly through their own employees, the present defendants obtain insureds through the efforts of independent businessmen operating under the American Agency System. In the use of that system there is no direct solicitation by the company. The "agent"

4. The Hartford's letter to its agents went out on June 6, 1962. Aetna's rejection was on July 17, 1962.

who solicits automobile liability risks collects the premiums from the insured and in turn is liable to the company for the amount of the premiums less his commission. The policy is issued by the agent and countersigned by him; he has the power to cancel the policy during its term. He also acts as "agent" for competing insurance companies, and may choose in which of these he will place a particular risk. Although called an "agent," the relationship has been distinguished as being rather that of an independent contractor. *See* Hedlund v. Farmers Mutual Auto. Ins. Co., 139 F. Supp. 535 (D.Minn.1956); *cf.* Northwestern Mut. Life Ins. Co. v. Tone, 125 Conn. 183, 4 A.2d 640 (1939). That this particular relationship of an insurance agent to the company whose policies he sells is not in law one of principal and agent is so thoroughly established that it has come to be known in the law as the American Agency System, and the legal consequences of that relationship have been given effect by judicial decisions. Thus the court in *Hedlund, supra,* found it well established that upon termination of an insurance agency, whereby an independent agent has solicited business for the company, unless the agent is indebted to the company, all rights in the expiration dates of existing insurance procured by the agent belong to him. 139 F.Supp. at 537. And in Nelsen v. Farmers Mutual Automobile Ins. Co., 4 Wis.2d 36, 90 N.W.2d 123, 135 (1958), the court noted that under the American Agency System the exclusive right in an insurance agent of contacting his customers for the purpose of renewing the policies is called "ownership of renewals and expirations, and is sometimes called the American Agency System." See also Ballagh v. Polk-Warren Mut. Ins. Assn., 257 Iowa 1334, 136

N.W.2d 496, 501 (1965). Insurance companies operating under the American Agency System, and the courts as well, recognize that the "agent" has a right in X-dates analogous to that he would have in a trade secret. See Rest., Torts, § 757, comment b (1939), *quoted with approval in* Town & Country House & Homes Service, Inc. v. Evans, 150 Conn. 314, 318, 189 A.2d 390 (1963). The insured customer is, of course, free to place his insurance with anyone he pleases, or to give out the information about the X-dates on his own policies. Still, it seems most unlikely that an insured who disclosed the X-date on his automobile policy to the plaintiffs did so for the purpose of enabling the plaintiffs to sell that information to an insurance agent of their own choice and for their sole benefit.

From another side there is law which affords a degree of protection to the policyholder who is a potential customer for a renewal of his present policy against the full blast of competitive forces. Not only are the terms and rates of such insurance policies subject to regulation by the states, but most states, as an additional measure to protect insureds against the risk of dealing with incompetent or unscrupulous agents, require agents and brokers who solicit insurance business to be licensed. Since the X-dates were to be used for the purpose of further solicitation of insurance, their acquisition by the plaintiffs could have been deemed a first step in such solicitation. This was the import of a public statement made by the Insurance Commissioner of Connecticut, who announced that the plaintiffs' collection and sale of X-dates in Connecticut would subject them to penalty under Conn. Gen.Stats. § 38–71 for acting as unlicensed insurance agents.[5]

---

5. Although it does not seem indisputable that the acquisition and sale of an X-date is a solicitation of insurance, it cannot be gainsaid that X-date data can ultimately generate income only in the hands of a licensed agent who through the use of such data sells insurance to customers whom he would not otherwise have contacted. The Commissioner's determination that dealing in X-dates constitutes the solicitation of insurance is entitled to great deference, since it represents the interpretation of a statute by the

**B.** *Grounds for Plaintiffs' Opposition to Summary Judgment*

**1.** *Plaintiff's Burden to Produce Evidence*

The plaintiffs cannot defeat defendants' motions for summary judgment on the mere hope that they may be able to discredit by cross-examination at trial the defendants' denials of any conspiratorial conduct in their respective rejections of plaintiffs' proposal. *Cf.* Dyer v. MacDougall, 201 F.2d 265, 269 (2d Cir. 1952). Under Rule 56(e), Fed. R.Civ.P.,[6] a plaintiff opposing summary judgment bears "the burden of producing evidence of the conspiracy he alleged . . . after [the defendant has] conclusively showed that the facts upon which [the plaintiff] relied to support his allegation were not susceptible of the interpretation which he sought to give them." First Nat'l. Bank v. Cities Service, 391 U.S. 253, 289, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569 (1968). The Supreme Court has decisively rejected the notion that "Rule 56(e) should, in effect, be read out of antitrust cases [so as to] permit plaintiffs to get to a jury on the basis of the allegations in their complaints, coupled with the hope that something can be developed at trial in

administrator charged with its administration. *See* Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965).

It should be noted that Connecticut's regulation of insurance solicitation has been expressly exempted from the otherwise superseding effect of federal law. The McCarran-Ferguson Act, 15 U.S.C. § 1012(b), provides that:

"No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance: *Provided*, That after June 30, 1948, the Act of July 2, 1890, as amended, known as the Sherman Act, and the Act of October 15, 1914, as amended, known as the Clayton Act, and the Act of September 26, 1914, known as the Federal Trade Commission Act, as amended, shall be applicable to the business of insurance to the extent that such business is not regulated by State law."

The Supreme Court has stated that this Act "did not purport to make the States supreme in regulating all the activities of insurance *companies*; its language refers not to the persons or companies who are subject to state regulation, but to laws 'regulating the *business* of insurance.' Insurance companies may do many things which are subject to paramount federal regulation; only when they are engaged in the 'business of insurance' does the statute apply. . . . [W]hatever the exact scope of the statutory term, it is clear where the focus was—it was on the relationship between the insurance company and the policyholder. Statutes aimed at protecting or regulating this relationship, directly or indirectly, are laws regulating the 'business of insurance.' " (Emphasis in original.) S.E.C. v. National Securities, Inc., 393 U.S. 453, 459–60, 89 S.Ct. 564, 568, 21 L.Ed.2d 668 (1969).

It thus appears that while approval and licensing of X-date dealing and dealers by state insurance authorities might remove such business from the ambit of federal antitrust law, the disapproval by state authorities of trafficking in X-dates places the traffickers between the state government's Scylla and the federal government's Charybdis. If punitive action by the state is successfully defended against by establishing that X-dates do not fall within state statutes regulating the business of insurance, then the X-date dealers are ipso facto open to federal antitrust liability. As I discuss hereinafter, *see* p. 554 et seq., *infra*, the risk of such liability seems considerable when the sale of X-dates is proposed on an exclusive basis.

6. Rule 56, Fed.R.Civ.P., provides in pertinent part:

"(c) . . . [Summary] judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

" . . .

"(e) . . . When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him."

the way of evidence to support those allegations . . . . While we recognize the importance of preserving litigants' rights to a trial on their claims, we are not prepared to extend those rights to the point of requiring that anyone who files an antitrust complaint setting forth a valid cause of action be entitled to a full-dress trial notwithstanding the absence of any significant probative evidence tending to support the complaint." *Id.* at 289–90.

## 2. *Conscious Parallelism*

■ The plaintiffs freely admit that in support of their basic contention that the defendants conspired to reject their proposal, they are unable to set forth specific facts in opposition to defendants' motions for summary judgment. The plaintiffs rely instead on the doctrine of "conscious parallelism" to supply an inference of conspiratorial conduct by the defendants of sufficient evidentiary weight to defeat the defendants' motions for summary judgment and to get their case to the jury at trial. "But [the Supreme] Court has never held that proof of parallel business behavior conclusively establishes agreement or, phrased differently, that such behavior itself constitutes a Sherman Act offense. Circumstantial evidence of consciously parallel behavior may have made heavy inroads into the traditional judicial attitude toward conspiracy; but 'conscious parallelism' has not yet read conspiracy out of the Sherman Act entirely." Theatre Enterprises v. Paramount, 346 U.S. 537, 541, 74 S.Ct. 257, 259, 98 L.Ed. 273 (1954). As Professor Turner has observed: "[I]denti-

cal but unrelated responses by a group of similarly situated competitors to the same set of economic facts . . . is not 'agreement' by any stretch of the imagination. . . . The point is that conscious parallelism is never meaningful of itself, but always assumes whatever significance it might have from additional facts." Turner, The Definition of Agreement Under the Sherman Act: Conscious Parallelism and Refusals to Deal, 75 Harv.L.Rev. 655, 658 (1962). See Kreager v. General Electric Co., 497 F.2d 468, 471 (2d Cir. 1974); Independent Iron Works, Inc. v. United States Steel Corp., 322 F. 2d 656, 661 (9th Cir. 1963), cert. denied, 375 U.S. 922, 84 S.Ct. 267, 11 L.Ed.2d 165.

The additional facts on which the plaintiffs rely to add flesh to the bare bones of their "conscious parallelism" theory of conspiracy are facts which plaintiffs contend establish that the identical courses of action taken by the defendants were, absent an agreement or understanding to act in concert, contrary to each defendant's individual self-interest. See Turner, *supra,* at 658–59. What the plaintiffs assert to be so irresistible about their proposal is the substantial competitive advantage the exclusive knowledge of X-dates would give the purchaser over the other companies in the solicitation of any automobile insurance sales just prior to expiration—the most advantageous time to obtain a new customer.[7]

## III.

Consideration of whether it was contrary to the defendants' self-interest to

---

7. It should be noted that the plaintiffs did not make any concrete offer to sell X-dates to any particular defendant. They invited offers from the defendants and from numerous other insurance companies, reserving to themselves the right to select which offer they would accept. And in so reserving the right to themselves to select which one agency insurance company they would deal with on an exclusive basis, the plaintiffs did not limit their choice to among any offers which might have been made by the defendants in this case. Thus the defendants could

not, by their own collusive refusal to deal with plaintiffs, have protected their flanks against the possibility that some other insurance company would elect to deal with the plaintiffs and hence secure exclusive access to the plaintiffs' X-dates. The defendants' refusal to bid on the plaintiffs' proposal did nothing to prevent the plaintiffs from selling their X-dates to other potential customers, including dozens of competing insurance companies and thousands of independent insurance agents.

reject the plaintiffs' proposal is, by virtue of the plaintiffs' reliance on conscious parallelism, the central element in the determination of the motions for summary judgment.

### A. Unsuitable Characteristics of Defendants' Business

#### 1. No Prior Dealing in X-dates

■ In the first place it is of fundamental significance that the defendants herein had not previously been in the business of buying or selling X-dates. Unlike the usual refusal-to-deal case, where a group by agreement refuses to buy from one seller a product which it buys from others, this is a case where no member of the defendant group had or has ever bought X-dates. The defendants' refusal to embark on this new undertaking accordingly cannot be classified as boycotting or blacklisting. Since the defendants have never purchased X-dates from anyone else, it is patently illogical for the plaintiffs to contend that they were being excluded from a nonexistent list. The plaintiffs were not being denied access to a product market open to others.

A distinction has to be made between a proposal to adopt a new practice or policy and the discriminatory application of an existing practice or policy. The plaintiffs' reliance on Klor's v. Broadway-Hale Stores, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959), is misplaced. In Klor's there was a refusal by a group of manufacturers of household appliances and their distributors to sell their products to a certain retailer, at the behest of others with whom they did deal. Although competitive appliances were available to Klor's from other manufacturers and distributors, the Court condemned the combination's refusal to sell to Klor's the same products on the same terms as they were sold to others. The Court found in this conduct a "creeping" tendency to create a monopoly, since the destruction of an individual competitor was the apparent objective of the combination. 359 U.S. at 213–14. The X-date is a tool which may be useful in the hands of the independent agent, or a salesman working for one of those insurance companies which sell insurance policies directly through their own employees. But it is not a product which the defendant companies buy or sell. There is no evidence that they have ever acted as distributors of X-dates.

#### 2. Dependence on Independent Agents

Unlike direct writers of insurance, the defendants must rely on independent insurance agents for the sale of their insurance. See note 1 supra. Given the American Agency System's recognition of an agent's property right in the expiration dates of policies he has sold, see pp. 549–550 supra, the defendants could reasonably anticipate a hostile reaction by independent agents to the proffering of X-dates by an agency insurance company.[8] Moreover, unlike a direct writing company, an agency company could not simply supply its agents with X-dates obtained through the plaintiffs. An agency company has no control over which insurance companies an independent agent may ask to insure risks solicited by him. Thus the plaintiffs' proposal contemplated that an agency company would resell its X-dates to its independent agents. The anticipated antipathy of the independent agents to the concept of the marketing

---

8. This is an appropriate place to note that the defendant CAIA, an association of Connecticut insurance agents, is not a competitor of any of the defendant insurance companies and that the plaintiffs never offered any proposal to it. The only apparent reason for making the association a party defendant emerges from the plaintiffs' argument that insurance agents, when they later learned of the plaintiffs' proposal, told the insurance companies that they were opposed to it. This they contend amounts to some kind of coercion to force the companies to reject the proposal. Apart from the fact that the decisions by the companies were made before the CAIA knew about them, the argument cuts against the plaintiffs' main contention that the rejections by the companies were the result of their having agreed among themselves to act in concert.

of X-dates could well have meant an agency company would have had no real resale market for X-dates, and hence no way to recoup the cost of acquiring these X-dates from the plaintiffs.

That the difference in business methods between agency companies and direct writing companies is of material significance is attested to by the fact that it was on this basis that the plaintiffs themselves viewed the two types of insurance companies as separate markets for their X-dates. The plaintiffs proposed to sell the same list of X-dates both to one agency company and to one direct writing company.

### 3. *Inability to Absorb Entire Output of X-dates*

This leads to consideration of another element in the plaintiffs' proposal. A condition of their proposal was that the company which the plaintiffs chose would be required to take all of the X-dates the plaintiffs would generate in the 50 states of the Union. This was estimated by the plaintiffs to be 9,000,000 X-dates each year. Thus the plaintiffs' proposal bore the heavy annual projected cost to any defendant of more than $4,000,000 per year.

The inherent commercial impracticability of the plaintiffs' proposal is illustrated by the impact the proposal would have had on The Aetna had it extended and been held to the offer solicited by the plaintiffs. The Aetna's total advertising budget was only about $1,000,000 annually, and it was trying to reduce that. Furthermore, not only were 9,000,000 X-dates per year far in excess of what The Aetna could put to use, even if it could persuade its agents to buy them, but also many of the X-dates would be wholly valueless—those in areas where The Aetna lacked any facilities, and those which were X-dates of auto owners already insured by The Aetna.

The conclusion of The Aetna, arrived at after thorough consideration of the many factors involved, that the plaintiffs' price for its X-dates was too high, is brushed aside by the plaintiffs. They offer nothing but puffing chatter to rebut the reasoning which led to that conclusion. And it is clear from all the circumstances that the plaintiffs have not suddenly become so expert in the insurance business that their contrary opinion could be accepted as evidence.

### B. *Risk of Illegality of Plaintiffs' Proposed Exclusive Dealing Arrangement*

If the plaintiffs are content to disregard the high cost of the X-dates to the defendants as a factor to support rejection of their proposal, then inherent in their contention that it was against the defendants' self-interest to reject the proposal can only be their selling argument that the competitive advantage which the *exclusive* right to obtain and market X-dates would give was so complete that X-dates could be readily resold at any price the traffic would bear. But by this "exclusive" provision the plaintiffs created a problem of their own making. Curiously enough this "advantage" exposes a legal obstacle in the plaintiffs' proposal not adverted to by either party and not briefed.

What is wrong about the plaintiffs' proposal in the context of the antitrust laws is not the defendants' negative response to it; it is the nonchalant assumption by the plaintiffs that an agreement to sell X-dates on a national scale exclusively to one insurance company would be lawful. Paradoxically, that so strongly emphasized feature of exclusiveness in the proposal made it risky for the defendants to accept it. While I reluctantly grab this bear by the tail, because the legality of the exclusive aspects of an accepted proposal is not now before the Court, its presence cannot be totally ignored. The issue is not whether the proposal should have been rejected as one which would result in an unlawful distribution system, but whether it was so fraught with elements of such a system that the *risk* of its illegality was substantial enough to justify the defendants' refusal to be a party to it. It would seem beyond cavil that had any

one of the defendants entered into the agreement as proposed, there was considerable likelihood that it would be held to be in violation of the antitrust laws.

### 1. Vertical Restraints Subject to Rule of Reason

■ The plaintiffs' proposal for an agreement under which one agency company was to be granted the exclusive right to market the X-dates furnished by the plaintiffs is known as a vertical arrangement.[9] While exclusive dealing provisions are not illegal per se, and certain exclusive territorial sales distributorships have been held not to violate the antitrust laws, *see, e. g.,* Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd., 416 F.2d 71, 76 (9th Cir. 1969), cert. denied, 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755 (1970); ABA, Antitrust Developments 1955–1968, at pp. 16, 109 (1968), vertical arrangements are by no means entitled to blanket protection against the strictures of the antitrust laws. In addition to § 1 of the Sherman Act's prohibition on contracts in restraint of trade, § 3 of the Clayton Act, 15 U.S.C. § 14, makes illegal any contract for the sale of "goods," the effect of which contract "may be to substantially lessen competition or tend to create a monopoly in any line of commerce."

In Tampa Electric Co. v. Nashville Co., 365 U.S. 320, 327, 81 S.Ct. 623, 628, 5 L.Ed.2d 580 (1961), the Court construed § 3 of the Clayton Act as forbidding exclusive-dealing arrangements whenever "the court believes it probable that performance of the contract will foreclose competition in a substantial share of the line of commerce affected." The Court also noted that § 3 was a "broader proscription" than §§ 1 and 2 of the Sherman Act. *Id.* at 335. In White Motor Co. v. United States, 372

U.S. 253, 263, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963), the first antitrust case to reach the Supreme Court involving vertical arrangements creating a number of geographically limited exclusive sales agencies, the Court reserved decision on whether such arrangements should be treated as illegal per se under § 1 of the Sherman Act.[10] The Court affirmatively applied a rule of reason to vertical arrangements in a later case, United States v. Arnold, Schwinn & Co., 388 U. S. 365, 374, 87 S.Ct. 1856, 1863, 18 L. Ed.2d 1249 (1967), observing:

> "[A] manufacturer of a product other and equivalent brands of which are readily available in the market may select his customers, and for this purpose he may 'franchise' certain dealers to whom, alone, he will sell his goods. Cf. United States v. Colgate & Co., 250 U.S. 300 [39 S.Ct. 465, 63 L.Ed. 992] (1919). If the restraint stops at that point—if nothing more is involved than vertical 'confinement' of the manufacturer's own sales of the merchandise to selected dealers, and if competitive products are readily available to others, the restriction, on these facts alone, would not violate the Sherman Act." 388 U.S. at 376.

See also Albrecht v. Herald Co., 390 U.S. 145, 153–54, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968); *id.,* 390 U.S. at 154 (concurring opinion).

### 2. Availability of Competing Products

In each of the above cases one factor considered as bringing vertical restraints within the rule of reason was the availability of competing products within the affected territories. This element of reasonableness is clearly not available in support of plaintiffs' proposed sale of exclusive rights to X-dates, since there exists no dispute as to plain-

---

9. "Economic arrangements between companies standing in a supplier-customer relationship are characterized as 'vertical.'" Brown Shoe Co. v. United States, 370 U.S. 294, 323, 82 S.Ct. 1502, 1523, 8 L.Ed.2d 510 (1962).

10. There were three dissenters in *White Motor*, Warren, Ch. J., Black, J., and Clark, J., who took the position that such vertical arrangements should be held forthwith to be per se violations.

tiffs' position that only through them could X-dates be obtained.

### 3. *Intent to Monopolize*

Another key factor in the determination whether a restraint of trade comports with the Sherman Act's rule of reason is "whether the action springs from business requirements or purpose to monopolize." United States v. Columbia Steel Co., 334 U.S. 495, 527, 68 S.Ct. 1107, 1124, 92 L.Ed. 1533 (1948). Here the exclusive-dealing arrangement proposed by the plaintiffs does seem to have been motivated by an effort to create a monopoly and to reap the fruits of monopoly power. On the basis of the negotiations between the parties as reflected by the record it is difficult to conceive of any reason for plaintiffs' insistence on restricting the marketing of X-dates to only one agency company for the entire United States other than to protect the plaintiffs' contemplated monopoly of the business in this field.[11] The advantages to some particular one of the defendants of the "exclusive right" among agency companies to obtain secret X-dates for all insured automobile owners in the United States were temptingly dangled before the defendants, and the possible danger from refusal subtly displayed. Although no portrait of the national market was drawn, the plaintiffs' own position was necessarily that their withholding of X-dates from all but one favored buyer would have a substantial impact on the market. The assumption that the plaintiffs' commitment to deal with only two insurance companies (one an agency company, the other a direct writer) would effectively foreclose other insurance companies from access to X-dates, due to the nonexistence of any other companies collecting and marketing X-dates, was implicit in, and an inescapable precondition of, the plaintiffs' proposal.

### 4. *Substantial Amount of Commerce Affected*

The plaintiffs' proposed exclusive-dealing agreement, despite its apparent monopolistic intent, could not escape scrutiny under the antitrust laws as too insignificant in its effect on commerce. The dollar volume of the sales "locked up" by the proposed agreement was $4,000,000, twenty times the $200,000 figure held sufficiently substantial in Fortner Enterprises v. United States Steel, 394 U.S. 495, 501–02, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969). Moreover, by virtue of the proposal's provision that the plaintiffs' entire output of X-dates would have to be purchased, the plaintiffs would have occupied the dominant position in the market, even if other producers of X-dates should seek to compete with the plaintiffs. *Cf.* Northern Pac. Ry. v. United States, 356 U.S. 1, 7, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958).

### 5. *Rejection Not Contrary to Self-Interest*

■ Any defendant which entered into the contract proposed by the plaintiffs would have run a serious risk of being in violation of the antitrust laws.[12] Whether the plaintiffs' proposal

---

11. That such a monopoly was the design of the plaintiffs is indicated by the price they proposed. The charge for X-dates which the plaintiffs set for the first batch they sold was 30 cents each; the price which the plaintiffs placed upon X-dates under the proposal for exclusive use was 45 cents each to two separate non-competing buyers, or a total of 90 cents. No examination into the cost of production is needed to understand that no appreciable cost would be incurred in multiplying the number of copies produced of lists of X-dates in order to make them

available to hundreds of insurance companies —and thousands of insurance agents.

12. A thoroughly reasoned opinion by Judge Wyatt in United States v. Chicago Tribune-New York News Syn., Inc., 309 F.Supp. 1301 (S.D.N.Y.1970), holds that an agreement by a copyright owner "not to license the features to any other newspaper published *within an arbitrary and unreasonably broad territory* surrounding the contracting newspaper's city of publication" (emphasis in original) states a claim of an unreasonable

would, if implemented, have led to actual antitrust liability does not have to be decided. X-dates may or may not be "goods" within the meaning of § 3 of the Clayton Act, and the plaintiffs' proposed exclusive-dealing arrangement for the sale of X-dates may or may not have been an "unreasonable" restraint under § 1 of the Sherman Act. All I conclude is that it is surely plausible that these questions might have been decided adversely to any defendant who dealt with the plaintiffs on the plaintiffs' terms. It follows that the Damoclean sword of antitrust liability which would have hung over the head of any defendant which had committed itself to deal with the plaintiffs, rendered acceptance of the plaintiffs' proposal so risky that rejection cannot be considered to have been contrary to any defendant's "self-interest."

### C. *Conclusion*

There is no direct evidence that the defendants or some of them informed one another they were rejecting the plaintiffs' proposal. The plaintiffs do not assert that they informed the others that The Travelers had rejected their proposal, or that they informed The Aetna that The Hartford had also rejected it. But even if it is assumed, despite the absence of direct evidence of communication, that the defendants became conscious of the actions taken by each relative to plaintiffs' proposal, this leaves the plaintiffs short of supporting their contention that an inference of conspiratorial conduct may be drawn from the evidence submitted under the rubric of "conscious parallelism."

There is nothing other than the simple fact that each defendant rejected the plaintiffs' proposal on which to base an inference of conspiracy. The arguments

of the plaintiffs that it was against the self-interest of each defendant to reject their proposal are completely unsupported. To let a jury decide that it was against the self-interest of an insurance company to refuse to tender an offer to commit itself on an all-or-nothing basis to a $4,000,000-a-year investment in a virtually untested and as yet largely undeveloped product would be to let speculation rule the case. *See* Independent Iron Works, Inc. v. United States Steel Corp., *supra*, 322 F.2d 656; Delaware Valley Marine Sup. Co. v. American Tobacco Co., 297 F.2d 199, 205 (3d Cir. 1961), cert. denied, 369 U.S. 839, 82 S.Ct. 867, 7 L.Ed.2d 843 (1962). It would be equally injudicious to allow the jury to have the opportunity to decide that the defendants were not justified in rejecting the proposal, even though its acceptance would expose them to a not inconsiderable risk of incurring criminal sanctions and of defending against a treble damage claim under the antitrust laws brought on behalf of a class potentially encompassing not only all competing agency companies, but also all independent insurance agents other than its own.

■ The defendants are not required to disprove the allegations of conspiracy in order to prevail on their motions for summary judgment, First Nat'l. Bank v. Cities Service, *supra*, 391 U.S. at 289–90. They have, by affidavits and depositions of facts as to which there is no genuine issue, made a showing so conclusive that the bare facts upon which the plaintiffs rely simply could not lead a reasonable man to agree with that interpretation which the plaintiffs argue should be extracted from them. To defeat the defendants' factually replete separate motions for summary judgment no more was required of the plaintiffs

---

restraint of trade in violation of the antitrust laws. 309 F.Supp. at 1302. Judge Wyatt ruled that writings protected by the Copyright Act do not confer upon their owner any greater right to sell or license the use of the copyrighted material under exclusive-dealing agreements than that possessed

by an owner of any other kind of property. It would thus seem, a fortiori, that agreements by which secret X-dates are sold or licensed for use so as to foreclose nationwide their dissemination to other than the agents of a single purchaser, might well constitute an unreasonable restraint of trade.

but that they come forward with something of substance in the way of evidence to in some way rebut the defendants' showing and to lend some support in reason to the plaintiffs' allegations. *Cf.* Poller v. Columbia Broadcasting, 368 U.S. 464, 473, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962). This they have not done.

Accordingly, summary judgment should be entered in favor of the defendants, and it is

So ordered.